UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

# 05   10516 MLW

THOMAS JAMES JADLOWE

V.

MAGISTRATE JUDGE New May

THE TOWN OF DARTMOUTH
LEONARD GONSALVES
MICHAEL J. GAGNE'
DONALD A. PERRY
SCOTT E. SILVIA
JOEL S. REED
JEANNE E. LENTINI

RECEIPT # 62892
AMOUNT $250
SUMMONS ISSUED YES
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK DM
DATE 3|18|05

**COMPLAINT AND JURY CLAIM**

JURISIDICTION AND SUMMARY OF CLAIMS

**JURISDICTION**: This court has jurisdiction in this action
because the Plaintiff is making a claim for relief under 42
USC 1983 for a violation of the Plaintiff's rights under
the United States Constitution.

**SUMMARY OF CLAIM**: The Plaintiff alleges he is entitled to
relief under 42 USC 1983 in that he was denied equal
protection of the law.  See Village of Willowbrook v Olech,
528 US 562.   Plaintiff alleges that the individual
defendants, Gonsalves, Gagne', Perry and Silvia conspired
to deprive the plaintiff of his property rights to develop
his land at 30 Arch Street Dartmouth Massachusetts, and
that this action was motivated by an animus against the
Plaintiff directly and his son Marc Jadlowe for political
comments by Marc Jadlowe and writings on the Plaintiff's
property at 30 Arch Street.  The Plaintiff obtained a
building permit in 2001 and lawfully begun remodeling of
his home at 30 Arch Street in 2001.  But because of the
animus alleged, Gonsalves, Gagne', and Perry conspired to

stop the remodeling project, and to that end forced the building commissioner-zoning enforcement officer (hereinafter the "ZEO") under a threat that he would be terminated to issue a cease and desist order to the Plaintiff on March 19, 2002.   The Plaintiff filed a Civil action in the state court to enjoin the ZEO's Order, and at his deposition the ZEO stated that he believed the project complied with the town zoning bylaw, but that he issued the order because he was afraid of losing his job.  There was a trial of the matter in the state court and the court ordered the cease and desist order vacated, but barred completion of the project for period to give the new ZEO time to issue an appropriate order of he believed one should issue.    The new ZEO issued a new order Stop Work Order on November 24, 2003 and advised the plaintiff to proceed to the ZBA with a new appeal.  The plaintiff believing that would be a fruitless endeavor given the ZBA's past conduct filed his appeal with the State Building Code Appeals Board pursuant to 780 CMR ; the town filed a motion to dismiss which has been briefed but no decision has been received from the state.  Sometime in mid-2004 the Town approached the Jadlowes, and started to discuss ways to resolve the dispute without the presence of any attorneys.   In November 2004, the Town prepared and submitted an application in Mr. Jadlowe's name for a special permit and variance with the ZBA. That permit and variance was granted, but an alleged aggrieved party has filed an appeal.  Plaintiff alleges that given the history of this case, the Defendants were aware that such an appeal would be filed, further the Defendant Silvia who was a member of the ZBA that voted to grant the variance and special permit has now taken the public position attempting

2

to impeach the ZBA's vote, and has joined the conspiracy of denying to the Plaintiff the equal protection of the zoning bylaw since a lot owned by him with essentially the same alleged zoning problems was in fact granted a special permit to proceed without objection by Perry or other town officials.

In short the Plaintiff alleges that the Town acting through the named individual defendants (excluding Lentini) adopted a policy to deny the Plaintiff the right to develop his property by denying him the equal protection of the zoning bylaw. The Defendant Lentini was the stenographer in the state court trial and has willfully failed and refused to prepare the transcript, and she is joined to ensure all parties necessary to complete relief are parties in this court; and her conduct is impairing the Plaintiff's right of access to the courts. The Plaintiff will be looking only for an order from this court that she complete the transcript in a reasonable time period.

FACTS COMMON TO ALL COUNTS:

1) Your plaintiff is Thomas James Jadlowe, who is a United States citizen and a resident of Bristol County Massachusetts.
2) Your defendants are:
   a) The Town of Dartmouth, a Massachusetts municipal corporation located in Bristol County, Massachusetts.
   b) Leonard Gonsalves, a former Select Person of the Town of Dartmouth who during the applicable times was acting under color of law.

c) Michael J. Gagne' the executive administrator of the Town of Dartmouth who was during the applicable times acting under color of law.

d) Donald J. Perry the Town Planner for the Town of Dartmouth who was during the applicable times acting under color of law.

e) Scott E. Silvia the Chairman of the ZBA who was during the applicable times acting under color of law.

f) Joel S. Reed the Director of Inspection Services for the Town of Dartmouth and during the applicable periods in this complaint was the acting Zoning Enforcement Officer or the Assistant Zoning Enforcement Officer or the Zoning Enforcement Officer; and who was at all times acting under color of law.

g) Jeanne E. Lentini, a court stenographer, who was acting under color of law.

3) All individual defendants are sued in their individual capacity. No monetary damages are sought against Reed or Lentini; but they are joined to ensure that the Plaintiff will receive a complete judgment in this action. If the Court were to issue an order revoking the stop order now in force and described in this complaint, Reed would be the person to whom the order would be addressed. Ms. Lentini is a necessary party to ensure that the Plaintiff has full access to the courts to protect his rights.

4) The Plaintiff owns the real estate known as 30 Arch Street in Dartmouth, Massachusetts. The lot came into existence prior to the zoning in the town of Dartmouth and it has been owned by Mr. Jadlowe, or his predecessor in title (his father in law) since 1942. At the time it was purchased there were two structures on the property, a main house fronting on Arch Street (hereinafter called

4

the "house") and a second structure to the rear of the lot, which has been described as originally being a barn. At some time after Mr. Oliveira acquired the property in 1942, he converted the barn into a art studio, and at some point installed a bedroom and bathroom and there is a dispute as to whether a kitchen was in fact in existence in the structure (hereinafter called the "studio/apartment"). The lot had a depth of 80 feet but the front line on Arch Street is described as being 145 feet but in plans used by the town and the Plaintiff that dimension is shown as 80 feet; whichever dimension is used the lot had more than 5,000 square feet.

5) In 1998 the then owner Mr. Oliveira and his grandson Marc A. Jadlowe (the plaintiff's son) applied for a building permit to renovate the studio/apartment. The defendant Gonsalves caused the work on the property to be stopped because of an alleged violation of the zoning bylaw. Marc Jadlowe was required to file an application for a special permit with the Dartmouth Zoning Board of Appeals (hereinafter the "ZBA"). The application was denied with the understanding that the work could proceed if Marc A. Jadlowe joined the two structures on the property by building a gazebo between them and joining them with a an arch way. The arch way was constructed and project was completed and a certificate of occupancy was issued.

6) On March 16, 2001 the Plaintiff acquired title to the property from his father-in-law and on March 21, 2001 he applied for a building permit to remodel the house.

7) The Town initially issued a demolition permit for the demolition of the second floor of the house and part of the first floor. During the demolition, it was decided on the advice of the Defendant Reed to completely rebuild

5

the house, and at Reed's request the foundation was moved
westerly about 6 to 7 feet.  The original side line to
the east had been 4 feet from the house; and it was now
increased to 10 or 11 feet.  The set back from the street
was not changed, but the front part of the house nearest
the street was increased in height.

8) The plaintiff submitted the necessary plans to the Town
of Dartmouth Building Department, and they were approved
by Reed who as the time was the Assistant Building
Inspector/Zoning Enforcement Officer.  Reed was present
during the demolition and construction and never raised
any issue with the project.

9) Sometime in December 2001, the Defendant Gonsalves spoke
to Reed and informed Reed that Gonsalves thought the new
house structure was in violation of the town's zoning
bylaw. Reed informed Gonsalves that because of the
exemption in the zoning by law which reads
"Non-conforming structures which are legally in existence
prior to October 26, 1993 shall be considered in
compliance with this Zoning Bylaw"; the property was
exempt from the set-back and the height restrictions.
Reed further explained that the Town had adopted a policy
in December 1998 that all structures in existence on
October 26, 2003 were allowed to be reconstructed and
expanded along its existing set-back line, except that it
could not be extended any closer than 10 feet from the
property sideline. Further, that an exempt structure
could be expanded as far as height was concerned up to
the 35 foot height restriction; and based on that
December  1998 policy the building permit had been
properly issued.

6

10)  Gonsalves then contacted the Defendant Gangne' to
     pressure then Town Counsel to issue an opinion that
     rejected the December 1998 policy; and there were at
     least one and possibly more executive sessions of the
     Select Board to put pressure on the then ZEO (Silveira)to
     stop the project.

11)  The ZEO initially refused to stop the project but
     finally on March 19, 2002 did issue an order to stop the
     project. See Exhibit "A". At the time the order was
     issued the house was 65 % completed.

12)  The plaintiff filed a suit in the state court and
     sought a restraining order against the ZEO, and the court
     after a preliminary hearing issued an order, preventing
     the Town from demolishing the structure; but ordering the
     Plaintiff to seek relief from the ZBA. See Exhibit "C".

13)  The Plaintiff filed an administrative appeal and an
     application for a special permit with the town ZBA.  The
     ZBA denied any relief to the plaintiff; even though the
     ZEO had stated at his deposition that he believed the
     building permit was properly issued and that he would not
     have issued the cease and desist order except that he
     thought he would be terminated if he did not do so.

14)  The Plaintiff filed a second action appealing the
     ZBA's two decisions and that case was consolidated for
     the purposes of trial with the original action.

15)  The original action was tried jury waived and , the
     court vacated the cease and desist, but enjoined the
     Plaintiff from completing the remainder of the project
     until December 4, 2003; to give the defendant Reed who
     was then the acting ZEO time to issue any appropriate
     order.  The plaintiff filed an appeal of that decision

7

but it has been held up because the stenographer has
failed to file the transcript in a timely fashion.

16)  On November 24, 2003 the defendant Reed issued a stop
order to the Plaintiff, stopping any further work on the
project. See Exhibit "E".

17)  The Plaintiff appealed that order to the State
Building Code Appeals Board, since he did not believe
that he could get a fair hearing before the ZBA. The Town
filed a motion to dismiss alleging the Board had no
jurisdiction in the matter, the matter has been briefed
but no decision has been received as of this date.

18)  Some time in 2004 the Town acting through the
Defendant Gagne' approached the Plaintiff to discuss
resolution of the matter without the intervention of
attorneys.

19)  Pursuant to those conversation the Town prepared an
application to be filed with the ZBA, and had Jadlowe
sign it but the Town paid the filing fee of $397.00 and
the matter was presented to the ZBA on November 16, 2004
and the ZBA allowed the application.

20)  An alleged aggrieved party (Frates) filed an appeal to
the Superior court and that case is now pending in that
court.

21)  The plaintiff alleges that Gagne' when he filed the
petition with the ZBA knew of should have known  that
Frates would file an appeal; and the allowance of the
2004 Petition was only an attempt by the Town to stop
damages from accruing.

22)  The plaintiff alleges that Gonsalves, Gagne', and
Perry conspired to prevent the Town's zoning exemption
from benefiting the Plaintiff but took no steps to
enforce the law in the same manner as they did with

8

Jadlowe.  That in 2004 the defendant Silvia owned a piece
of property on 11 Old Westport Road Dartmouth and the
prospective buyer obtained zoning relief that was denied
Jadlowe.

23)  The plaintiff alleges that Gonsalves was upset about
remarks made publicly by Marc A. Jadlowe after Gonsalves
had intervened in remodeling of the studio/apartment in
2000 and 2001.  Some of those remarks and comments were
written on the wall of the house, and Jadlowe publicly
opposed the election of Gonsalves and sought support for
the termination of Gagne' and raised issues as to whether
Gagne' had received improper town benefits because of his
office.

24)  That as a result of that animosity Gonsalves used his
office in 2003 to force the ZEO to treat the plaintiff
differently than any other property owner similarly
situated; that is the owner of a substandard sized lot
with a structure on it in existence since October 26,
2003; and to not apply the December 1998 policy to
Jadlowe.

25)  The defendants Gonsalves, Gagne' and Perry were
present at a meeting on March 11, 2003 and knew that
there was a policy in place as described to Gonsalves by
Reed and knew that the ZEO believed that the plaintiff
had been properly issued a building permit.  See Exhibit
"D" the minutes of an Executive Meeting of the Select
Board.

26)  Notwithstanding that the Defendants Gonsalves and
Gagne' and Perry were aware of the Town's policy, they
conspired to adopt a policy to prevent the plaintiff's
home from being completed and to thereby treat him
differently than any other similarly situated property

9

owner, and to force him to take the structure that he had constructed down.

27) Pursuant to that conspiracy, Gagne' sent letters to the ZEO and the town counsel, and prepared and delivered to the ZBA an administrative appeal of the ZEO's act of issuing the Building Permit to Jadlowe, even though he knew such an appeal was late. The ZBA agreed to hold the appeal to see if ZEO did in fact cave in to the pressure and issue a cease and desist order.

28) Pursuant to that conspiracy Perry in fact issued adverse opinions to the ZBA and knowingly failed to disclose the existence of the December 1998 Town policy as to the treatment of structures in existence on October 26, 1993; and later encouraged the Planning Board to issue a letter to Reed to issue a stop order to Jadlowe after the state litigation and again Perry intentionally failed to inform the Planning Board of the existence of the original Town policy. Further, Perry also issued a letter in support of the application of the 1998 policy with regard to the Silvia property on 11 Old Westport Road. When the Town's petition on behalf of Jadlowe in November 2004 was before the ZBA Perry submitted, as is the town custom a letter advising the ZBA on the application of the zoning bylaw of the matter before the Board; and in that letter he again willfully misstated the facts as to the joinder of the house and the studio/apartment in 2002 thereby creating one single family unit; and failed to apprise the ZBA of the fact that the Town had singled out Jadlowe for treatment different from any other person so situated.

29) The Plaintiff alleges that the Town acting by and through the defendants and the Select Board adopted a

10

formal policy to prevent Jadlowe from constructing his
home, and with the intention of forcing him to remove the
structure.

30)   Further, Perry testified at the state trial that there
was an undisclosed policy that Jadlowe violated, that is
in the construction of an extension of or rebuilding of a
structure that existed on October 26, 1993, the owner had
to engage in a "fiction" he/she had to leave one of the
old walls up and that would be considered a extension or
remodeling and not a reconstruction; and a different rule
would apply if it were a reconstruction, this so called
town policy is not published and was not conveyed to
Jadlowe and was created to hamper Jadlowe from obtaining
relief from the ZBA.

31)   The Defendant Silvia in late 2004 and/or early 2005
joined the conspiracy to prevent Jadlowe from completing
his project, by attempting to impeach his own vote to
grant Jadlowe relief from the zoning bylaw.  Silvia now
alleges that he received a call from Gagne' asking that
the ZBA to support the Jadlowe application and that fact
was never disclosed at the hearing and if he knew that
fact had not been disclosed on the record he would have
voted differently. He disclosed this fact ex parte to
Frates attorney with the intent to impeach the vote of
the ZBA granting relief to Jadlowe.  Silvia has also
engaged in a very public dispute with the Select Board of
the relocation of the ZBA office to the Building
Department and has publicly stated that the former ZBA
chairman was not reappointed because he had refused to
commit himself on the Jadlowe matter to Gagne'.

32)   Silvia has joined the conspiracy that the Jadlowe
property should be treated differently from property

11

similarly situated, including his own lot at 11 Old
Westport Road; and that Jadlowe should not be permitted
to complete his construction.

33)  As a result of the defendants conduct the plaintiff
has been deprived of the use of his land, incurred legal
costs to defend his property rights, and suffered
emotional distress.

## CLAIM ONE   42 USC 1983

34)  The Plaintiff re-alleges the allegations of paragraphs
1 to 33; but excludes from this Count the Defendants Reed
and Lentini.

35)  The Defendants, the Town of Dartmouth, and the
individual defendants Gonsalves, Gagne', Perry  and
Silvia have conspired to and have acting under color of
law denied the plaintiff the use of his home and have
treated him differently than others similarly situated
and purposely adopted a policy to deny the plaintiff the
use of his land in the manner originally approved by the
town pursuant to a policy adopted in December 1998.
Further, all the Defendants were aware that under the
applicable law and the December 1998 town policy the
plaintiff's project was permissible, but they caused the
Town to adopt a policy to prevent Jadlowe from completing
his project. That such conduct was a denial of the
plaintiff's constitutional right to equal protection of
the law as set out in the Fourteenth Amendment.

36)  That as a result of the conduct of the Defendants the
plaintiff suffered compensable injury including emotional
distress.

Wherefore the Plaintiff demands judgment for compensable
damages and attorney fees and as against the individual

12

defendants, Gonsalves, Gagne', Perry and Silvia punitive damages as allowed by law.

## CLAIM TWO EQUITABLE RELIEF as against all defendants but Lentini

37)  The Plaintiff re-alleges the allegations of paragraphs 1 through 37.

38)  The Plaintiff seeks in this claim equitable relief and an order from the Court, order the Defendant Reed to revoke his Stop Order and to enter an order on the building permit that the permit is extended to a period fixed by the court to allow for the completion of the project.

39)  The Plaintiff seeks to have the court retain jurisdiction for the few months it will take to complete the project and to ensure that inspections are completed promptly.

Wherefore the plaintiff demands judgment in the form of a injunction granting the relief asked for in paragraphs 38 and 39 and such other relief as justice may require.

## CLAIM THREE EQUITABLE RELIEF as against Lentini only.

40)  The Plaintiff re-alleges the allegations of paragraphs 1 through 39.

41)  The plaintiff believes that the allegations show that Lentini has in fact violated the plaintiff's first amendment rights of access to the courts, but even if treated as solely a state cause of action, the plaintiff asks the court to retain jurisdiction so that the plaintiff may receive complete satisfaction of his 42 USC 1983 claims against the other defendants.

42)  The plaintiff seeks only equitable relief against Ms. Lentini, that the court order a speedy transcription of

the trial record in the state court action.  The funds to
pay for that transcript were deposited with Ms. Lentini
and she was ordered to file the deposit with the Court
because she was not transcribing the record in a
reasonable time frame.  See the attached order of the
Court, the docket does not show the order has been
complied with.

Plaintiff therefore demands a judgment in the nature of an
order from this court that the record be transcribed, a
copy of the record be filed with the state court and copy
supplied to the Plaintiff's counsel.

The Plaintiff
By his attorney

Donald J. Fleming, Esq.
86 Church Street
Mattapoisett, MA 02739
BBO# 171460
Tel 508 758 6982 Fax 598 758 3406

THE PLAINTIFF CLAIMS JURY TRIAL ON ALL ISSUES TO WHICH THE
PLAINTIFF HAS A RIGHT OF JURY TRIAL AND AS TO ALL OTHER ISSUES
THE PLAINTIFF ASKS THE COURT PURSUANT TO RULE 39 TO FORM JURY
ISSUES TO BE SUBMITTED TO THE JURY AT TRIAL.

# DARTMOUIH  MASSACHUSETTS

*CEASE &*
*DESIST*

**BUILDING DEPARTMENT**
400 SLOCUM ROAD · P. 0. Box 79399
**DARTMOUTH.** MA 02747-0985
**DAVID J. SILVEIRA**
BUILDiNG COMMISSiONER **&** Z.E.O.
TEL: (508) 910-1820 · FAX: (508) 910-1838



March 19, 2002

Thomas James Jadlowe
and/ or Mark Jadlowe, Authorized Agent
30 Arch Street
Dartmouth, MA 02748

Re: Permit # 2001-21468  30 Arch Street, Plat 128 Lot *157* Dear Mr. Jadlowe:

Please be **advised** that after intensive review with Town Counsel and others I find that

work under Building Permit #2001-21468 dated November 20, 2001, is in violation of the

setback provisions of Zoning By-law, section 5.404 EXEMPTIONS FROM SETBACKS

(enclosed).

Therefore, it is my duty to

inform you that you must *cease*

Page 1



EXHIBIT
*A*

& *desist* forthwith from work on your project per the Building Permit noted above and remove that portion of the structure which is in violation or relocate the structure on the lot to meet setback requirements. You may also apply for a variance to allow the existing work to remain.

Plans for removal shall be submitted to this office within fourteen (14) days of plans. You are to commence demolition or removal within fourteen (14) days after approval of plans.

You have thirty (30) days to appeal this order to the Dartmouth Board of Appeals per MGL Chapter 40A section 8 and section 15 and Local Zoning By Law section 27. 500.

You are requested to inform this agency within (5) business days as to your intentions in this matter.

Be advised that any work continued after this order is received by you will be at your own risk.

You have certain legal rights in this matter and should review this matter with your personal counsel.

Your early response as to your intentions would be appreciated.

**Respectfully,**
**David J. Silveira**
**Building Commissioner &**
**Zoning Enforcement Officer**
**DJS:sgh**

**CC: Michael 3. Gagné, Executive Administrator**
**Enclosure**
**Hand Delivered**

EXHIBIT

*A*

Page 2

EXEMPTIONS FROM SETBACK REQUIREMENTS

Buildings or structures which are legally in existence prior to October 26, 1993 shall be considered to be in compliance with Section 5.404 and are allowed to expand along the setback line or lines of the existing building/structure to a point which intersects another existing setback line of the same building/structure or to a point that intersects the setback defined in Section 5.404. Expansions are prohibited into the intersection sight triangle setback or within five (5) feet of any perimeter property line. Exempt expansions shall not exceed the height of the part of the existing structure/building being expanded except where the expansion is outside the current setback and height is otherwise allowed by zoning.

In addition, buildings or structures may be placed a minimum of 10 feet from all other perimeter lot lines or 30 feet from a street line if the lot upon which the building or structure is to be located was in existence prior to October 26, 1993. The benefit of this exemption is available to lots which already had buildings or structures located thereon prior to October 26, 1993.

Swimming pools are allowed to be placed within 10 feet of a perimeter property line or 30 feet from a street line.

The setback of parking facilities is regulated by Section 5.407 and Section 16 of the Zoning Bylaw. Fences, stonewalls, retaining walls and boundary delineation structures under six (6) feet in height are exempt from these setback requirements, but are subject to the intersection sight triangle setback.

5A05    Height
The maximum height of all buildings or freestanding strictures shall be 35'. Non-habitable structures placed on top of buildings shall not exceed 50' in height Height shall be measured from the average of the finished grade at the foundation around the building or structure, to the highest part of the building or structure or to the average level of the highest gable or slope of a hip roof Where non-habitable structures exceed 35' in height the non-habitable structure shall be setback from all property lines at least twice the height of the non-habitable

5.406    Percentage of Lot Coverage

In GENERAL RESIDENCE Districts, all uses on a lot which include, but are not limited to: buildings, structures, driveways, parking areas, gravel areas, walks, patios, storage areas, impermeable surfaces, etc. shall not cover more than 50% of the lot Natural areas such as landscaping, gardens, lawns, etc. are not regulated within the 50% requirement

5.407    Parking and Driveways
The number of Off-Street Parking spaces shall be provided in accordance with the following table:

| Use | 4 of Parking Spaces Required |
|---|---|
| Single Family Dwelling | 2 per dwelling |
| Garages, Sheds, Storage Bldgs. | 0 |
| Renting of Rooms | 1 per renter |
| Accessory Apartments | 2 per accessory apt |
| Home Occupation | 1/200 s.f. plus 1 per amp. |
| Home Educational Uses | 3/200 s.f plus 1 per amp. |
| General Educational Uses (non profit) | 1/400 s.f of educational space |
| Place of Worship | 1 per 4 ocarpants |

EXHIBIT
A





**COMMONWEALTH OF MASSACHUSETTS**

BRISTOL, SS.

**SUPERIOR COURT**
**CIVIL ACTION**
**NO. 02-0480**

**THOMAS J. JADELOWE and**
**MARC JADELOWE,**

Plaintiffs,

V.

**TOWN OF DARTMOUTH**
**and**
**DAVID J. SILVEIRA,**
**as Building Commissioner and**
**Zoning Enforcement Officer**
**of the Town of Dartmouth,**

Defendants.

**RULINGS AND ORDERS RESULTING FROM**
**THE PLAINTIFFS' APPLICATION FOR**
**PRELIMINARY INJUNCTIVE RELIEF.**



EXHIBIT
B

1138

1

## RULINGS and ORDERS.

Upon consideration of the Complaint, the Affidavit of Marc Jadelowe including all

exhibits, the municpal defendants' Memorandum in Opposition to Preliminary Injunction,

and the arguments presented and discussion conducted at the injunction hearing of April

25, 2002, the court rules and orders as follows.

1.    It preliminarily enjoins the defendant Town of Dartmouth, including any of

its agencies and officers, from the demolition of the structure at 30 Arch Street.

2.    It preliminarily enjoins the plaintiffs Thomas J. Jadelowe and Marc

Jadelowe from further construction of the building at 30 Arch Street until further action

of the court.

3.    It authorizes the plaintiff Jadelowes to take all reasonable measures to

safeguard the structure against the weather and to render the building and its contents

secure.

4.    The court directs all parties expeditiously to exhaust their administrative

rights and remedies in the Dartmouth Board of Appeals. An examination of the court



EXHIBIT

_B_

1139

2

papers filed to date indicates that elements of fact-finding and specialized discretionary

judgment may enable the Board of Appeals to resolve the present dispute. That

potentiality requires the exhaustion of administrative remedies before resort to the court.

See East Chop Tennis Club v. MCAD, 364 Mass. 444, 448-453 (1973); and Buteau v.

Norfolk County Retirement Board, 8 Mass. App. Ct. 391, 394-395 (1979) Alternatively,

if the decision of the Board leaves the plaintiffs aggrieved, they may pursue their claims

in this court by amendment to this suit to reflect any intervening action by the Board. In

all events the Board proceeding should advance swiftly so that the present uncertainty

does not drag forward with harm to the property of the plaintiffs and to the public interest

invoked by the defendant building commissioner.


5.      Out of concern for the need for speed (so that the partially constructed

residence does not remain in limbo through the next winter), the court (after consultation

with counsel at the hearing of April 25, 2002) sets the following schedule for litigation

progress. The schedule can proceed in combination with the presentation to the Board of

Appeals.


(a)      Completion of discovery by June 21, 2002.




EXHIBIT

B

1140

3

     (b)    Joint Pretrial Memorandum and Conference due on July 29, 2002.

     (c)    Trial on August 21, 2002.

6.    The issues of fact and law are finite and known to both sides. They should cooperate for their common interests in the efficient presentation of the dispute to the Board and, if necessary, the court.

Mitchell J. Sikora, Jr.
Justice of the Superior Court

Dated: May 3, 2002.

bk C \Court\Sikora\findings\jadelowevstownofDartmouth wpd

**A True Copy By Photostatic Process**
**Attest:**

**Asst. Clerk of Courts**



1141

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss                    Superior Court
No. CV2002-00480              Rule 30 Deposition

THOMAS JAMES JADLOWE &
MARC JADLOWE

vs.

TOWN OF DARTMOUTH &
DAVID SILVEIRA, the Building
Commissioner & Zoning
Enforcement Officer of the
Town of Dartmouth

DEPOSITION OF DAVID SILVEIRA, taken

pursuant to Rule 30 of the Massachusetts Rules of

Civil Procedure on behalf of the Plaintiff, before

Mary Ann C. Escobar, a Notary Public in and for the

State of Massachusetts, at the Town Hall, 400 Slocum

Road, Dartmouth, MA commencing at 10:00 a.m., on

Tuesday, June 18, 2002, pursuant to Notice and

agreement of parties as to the date and time of

taking said deposition.

APPEARANCE    Donald Fleming, Esquire
              FLEMING & ISHIHARA
              86 Church Street
              Mattapoisett, MA 02739
              Representing the Plaintiffs

              John A. Birknes, Jr., Esquire
              Town of Dartmouth Town Counsel
              400 Slocum Road
              Dartmouth, MA 02747-0985
              Representing the Defendants

ALSO PRESENT  Thomas Jadlowe
              Marc Jadlowe

Goudreau & Grossi Court Reporting Service   (508) 823-4447

---

I N D E X

Direct  Cross  Redirect  Recross

DAVID SILVEIRA

By Mr. Fleming  4          51

By Mr. Birknes       45

E X H I B I T S

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit No. 1 | Stipulation | 4 |
| Exhibit No. 2 | Affidavit of Marc Jadlowe | 8 |
| Exhibit No. 3A | Complaint | 9 |
| Exhibit No. 3B | Answer | 9 |
| Exhibit No. 3C | Complaint and Answer | 9 |
| Exhibit No. 4 | Section 40A | 12 |
| Exhibit No. 5 | Appeal | 31 |
| Exhibit No. 6 | File for 1998 of 30 Arch Street | 42 |

**EXHIBIT**

C

Goudreau & Grossi Court Reporting Service   (508) 823-4447

---

(June 18, 2002
Tuesday, 10:00 a.m.)

DAVID SILVEIRA, a witness called on behalf

of the Plaintiff, having been duly sworn on oath,

deposes and says as follows:

MR. FLEMING:  Parties have entered into a

stipulation as to the conduct of the deposition and

specifically the parties have waived notice of this

deposition. The stipulation will be appended to the

deposition as exhibit for identification one

(Exhibit 1, Stipulation, was marked for

identification)

DIRECT EXAMINATION

Q  (By Mr. Fleming)  Would you tell us your name,

please?

A  Yes, my name is David J. Silveira.

Q  And, Mr. Silveira, would you tell us your

occupation?

A  I am the building commissioner and the zoning

enforcement officer for the Town of Dartmouth.

Q  And would you tell us your office address?

A  My office is located at 400 Slocum Road, Dartmouth

Mass.

Goudreau & Grossi Court Reporting Service   (508) 823-4447

418

**[Page 29]**

"It is my opinion that the residence
undergoing construction should not have been issued
a building permit without conforming to the
requirements for setbacks under 5.404"; is that
correct?

A  Yes.

Q  So the record will be clear this structure does have
a set -- 10 foot side line setback; right?

A  Yes, it does.

Q  So the only issue is the front setback?

A  The front.

Q  Is there any other issue with this project other
than the front setback?

A  As I see it, no.

Q  Okay.

And that's your opinion as the chief
enforcement officer; right?

A  Yes.

Q  Now, again, why does not the exemption we read apply
to the front setback?

A  It should.

Q  It should.

So if it applies to the front setback then
this project is in conformity with the zoning

**[Page 30]**

EXHIBIT
C

by-law; right?

A  Correct.

Q  All right.

Now, let us go back to 3A in Paragraph 27
again.

A  Say that again, please.

Q  I want to go back to the complaint in paragraph
think it's 27 we were looking at before.

A  Um hum.  I have it here.

Q  All right.

Do you know any reason why that exemption
under Section 6 would not be applicable?

A  I don't, no.

Q  Is there any reason why you should not revoke your
cease and desist order?

A  Other than the direction, no.

Q  Other than direction from whom?

A  Town counsel's advice and the executive
administrator.

Q  Well, but you're the chief enforcement officer and
we agreed at the beginning --

A  I know.

Q  -- that they cannot control you; right?

Mr. Silveira, I don't want to put you in a

**[Page 31]**

box but you know under the statute, right --

A  Yes, except in fear of my job I certainly would not
have done otherwise.

MR. FLEMING:  Why don't we break for two
minutes okay.

(Off the record)

Q  Except that you were concerned that your job might
be in jeopardy you would not have issued that cease
and desist order; is that correct?

A  Correct.

Q  I'm going to show you what's the next exhibit now,
Exhibit five.

(Exhibit 5, Appeal, was marked for identification)

Q  Are you aware that there has been an administrative
appeal filed?

A  Yes, I am.

Q  Do you know what the status of that administrative
appeal is?

A  I believe it's to be heard tomorrow night.

Q  Well, that's news to us, but we'll be there.

A  Hold it.  It's the 21st then.  It's next Wednesday.

Q  Next Wednesday?

A  I'm sorry.  It's a Wednesday.

**[Page 32]**

Q  We'll straighten it out.

A  But there is an appeal and it's coming up next week.

Q  If you would look to the third to the last page in
that package that we've marked as Exhibit Five --
strike that.

For the record Exhibit Five is a copy of the
administrative appeal that's been filed.  Have you
signed the administrative appeal?  Did they send it
over to you?

A  No, they did not.

Q  Has anybody asked your opinion with regard to the
administrative appeal?

A  No, they have not.

Q  Thank you.  Okay.

Do you see the document that's entitled
Rulings and Orders.  It's the third to the last
page.

A  Third to the last page.  Yes, I do.

Q  And you understand that the documents you're looking
at is a Court Order?

A  Yes, I do.

Q  And do you understand the Court Order that it
authorizes Mr. Jadlowe -- the plaintiffs Jadlowes to
take all reasonable measures to safeguard structures

Page 1

## VERBATIM MINUTES OF EXECUTIVE SESSION OF

### MARCH 11, 2002

Mr. Gagne:    Mr. Carney had an opportunity to travel with me about two weeks ago.

Mr. Carney:    I went to the Building Department to ask if there was any previous houses in the same situation as this home was in, and this is the list of houses that they felt were the same problem area as what we're talking about. Joel got this list for me. So, Mike and I went off, you notice some were crossed out, those are the ones we felt weren't even close to this situation. Here's what we're talking about.

Mr. Miller:    Nice piece of work there Bob! I know the guy probably wants to beat you up or kill you, but...you caught him on a mild day.

Mr. Carney:    Mike didn't tell me what kind of a character he was, so I took the picture.

Mr. Miller:    He was taking the picture and Marc Jadlowe came out and wanted to know who he was.

Mr. Carney:    Alright, This is Arch Street here. I'm not sure which ones on your list which one goes with where, but....

Mr. Gagne:    That's Pearl Street.

Mr. Carney:    This house here is near Lake Noquochoke. This piece of property is the one that is next to the Thai Restaurant, on Greystone Avenue. It's five feet from Ray Peck's property line. This here is Rogers Street...

Mr. Miller:    That one is Bridge Street, right?

Mr. Carney:    This one here, there's an empty lot next door, but the property line is right there. And I would imagine the property line here is pretty close. And this house here is tastefully done, but it's on a postage stamp. This one here, too, is nice, but the side lot is right in the same situation as this one is. I think there is something wrong with the system if we're allowing this to go on. If the rules say they can do it, we got to change the rules, if we can.

Mr. Miller:    Is your concern the height of the house, or the location of the boundary line?

Mr. Carney:    Just for example, this house has got the same setback, but it's right next to the sidewalk. The existing lot and the house next door is the same way. And even here,



/535

Page 2

they're all on small lots.

Mr. Miller:    They all have a common thing, they're all right on the boundary line and most of them are quite high, is that right?

Mr. Carney:    This is another house right here, and the property line is right here, I would imagine and it's right over here and on the back side, it's five feet from Ray's property. I know that house because I lived in that neighborhood. Even this one here in Padanaram, it's nicely done but it's... At lease we know what we're talking about. This is only a few. They told me that there is a lot more.

Mrs. Silva:    Okay, now I guess we go back to Mr. Silveira. I gather our Board's concern is how can this happen and between you and Donald Perry you're going to tell us how this all fits into a by-law, I guess, and what we can do about it. I think that's the bottom line. So if you'd like to begin...

Silveira:    Mr. Chairman. The situation here revolves around, obviously, the constructional by-law. That's the question, as far as I'm concerned. There have been some changes made, some made as late as 1980 in both residential districts, they were quite extensive changes. Along with that there was some new language put in to section 3B, which has a great impact on how we review all of this construction. Based on our early discussions with Town Counsel and review of the by-laws, it was our combined conclusion at that time, that this type of activity was feasible and as a result we've allowed the permit to be issued for these and many others that are somewhat similar, dealing with setback issues, and buildings on a lot, that kind of thing. This came about as a result of the case, I believe it was Goldbush (?) vs.(inaudible), that basically says that every house like this, if you are going to add, alter, construct on a non-conforming lot, or for a non-conforming use, has to go to the Board of Appeals for a Special Permit. We did that for about a year. I mean, it became obvious at that point in time that that was a really cumbersome task for people who were looking for the improvement of using smaller and somewhat substandard dwellings to upgrade. Discussions with Donald, discussions with the Planning Board, the fire laws were changed, help encourage the fact that people in residential situations make improvements without having to necessarily deal with the Board of Appeals (inaudible). As I said the conversations with Town Counsel, we looked at that many times. Some of these came in, and looked to us, understanding the rules, and at that point in time, still had questions on certain things. Can we do this, can we do that? Basically all the answers came back to be the same. You can do this, this is kind of (inaudible). So, as a matter of course, these permits came in and were generally handled by Mr. V in the matter of fact, business manner, the site was looked at, the project was looked at, to the somewhat general parameters of the combined bylaw, (inaudible) and here we are!

Mrs. Silva:    Okay Board members, any questions?

**EXHIBIT**
2

1536

Mr. Gagne:     I think what we ought to do is John has certainly given his opinion in writing, on the matter, I think we should recognize John.

Mr. Birknes:   I don't know if you all read what I had written on February 6th, but what you had here was a house that was constructed. I believe in accordance with a setback and lot size, several decades before. Then you have a structure toward the rear of this now undersized, small lot, that was starting to be maybe for residential stuff, and this residential unit went before the Board of Appeals and a 1998 case and was denied, 2 to 1, to have this shed in the back, a substantial shed in a residential area. So they went to the Building Department to see if there was some other way they could somehow make this shed fit and they ordered ... (inaudible), put that in as an addition to the existing dwelling, so, connected to the existing dwelling, determined to be an addition, and in effect (...inaudible...)  That was done. Then the (inaudible) come and say well, we got a new idea, we want to tear down the old house and we want to rebuild it and we have a bylaw that talks about expansion or change of one or two family, residential, non-conforming uses, which is what we have now, because now, the house, as it stands, does not meet the present requirements for setbacks from the front yard and side yard and so it's non-conforming to that extent, and this house is very close to the road, I'm told 4 feet. To look at it, it almost looks like it touches the Town layout, because of the (inaudible) sidewalk, it is within the Town layout. Anyhow, before this was granted, one of our what our bylaws say is that when you alter or change, and I'm interpreting in this case an alteration or expansion to encompass a rebuilding by tearing down and rebuilding and you might argue at that point, but giving it a literal interpretation, why the interpretation of alterations of expansion, let's assume he can do that, then you, go to our by-law that talks about a one, two-family, non-conforming residence and it says, yeah, it may be expanded or altered without a special permit through the Board of Appeals if the expansion or alteration meets the setback height and lot coverage standards of the zoning district in which the residential use is located. So they will issue the permit for sidelines which would now be 10 feet in for the new structure, but, the requirement now...(inaudible) back to the street. In Dartmouth, no, 21.2 In rebuilding a structure nothing is said about the addition, which had been brought into the main residence before, (inaudible) and states itself as a separate residential unit in the rear, with no explanation and no permits, as I can see it. You can't (...inaudible...) well, I'm going to say that we only have to use the sidelines setback, but not front yard, so that we can cut off this other piece and leave it standing alone and it's viable, (inaudible), because it happens to be there. Think about that. But that's an error, in my opinion, but what do you do about an error?  Then, let me just quote from a case, a 2000 housing case from the Town of Franklin. In the Town of Franklin, the Building Commissioner issued a permit for a couple of towers.   The Commissioner (...inaudible...) Talks about utilities. You know we're a utility and we can put this up because we (inaudible) and so they issued a permit for the towers and then (inaudible).   There's hearings before the Board of Appeals and so they go the Building Commissioner and say I want to put up a tower. So, he does. The building

$Rx \, D$

1537

Page 4

commissioner says I made a mistake - take them down. (Inaudible). And what that case says is several strong things. It is well-established that a municipality is not estopped by the acts of its officers, including the Building Inspector, from enforcing this strong bylaw. The right of the public from having the zoning bylaw properly enforced cannot be forfeited by the action of the municipality's officers, nor can a permit legalize the structure or use (inaudible). But, I suggested in my letter to you that if you wanted to have relief here, in my opinion, you know there's always the potential for liability, in the issue of cease and desist (...inaudible...) go before the Zoning Board of Appeals and apply for the variance and Special Permit (...inaudible...) need a Special Permit for that front yard setback. Will they get it? Politically speaking and practically speaking, (inaudible), probably not. And what we're going to do, the building, the developer, will probably appeal. What would be the results for the Town, and further, (inaudible), much like the Robinson case in the High School, assuming our public officers have been found to be mistaken. He doesn't owe a private duty to that builder, and if he makes a mistake, so be it. (Inaudible). I know that sounds harsh, but that's basically what the law is, but it's always subject to change when you get up before a court in which case I guess you'd have to consider our liability insurance. That's my opinion.

Mrs. Silva:    Does anyone have any questions for John? Hearing none, I guess next we'll hear Donald's interpretation from the Planning Board, and what your take is, your opinion on that by law area.

Mr. Perry:    Basically, David mentioned earlier, and you know that many years ago, many communities were governed by State statute as to non-conformance. Today, when an individual needs to exceed that non-conformity to build a shed or a porch, a variance is required. What was happening was a lot of the smaller lots had to get variances and so the Town was a little more generous in its bylaw to try and correct the situation and find a balance.

## TAPE FINISHED - GO TO NEXT TAPE

Buildings and structures which are legally in existence prior to October 26, 1993, shall be considered to be in compliance with Section 4A.404 setback requirements and are allowed to expand along the setback line or lines of the existing building/structure, a 20 foot minimum setback is required to be considered legally conforming to a point which intersects another existing setback line of the same building/structure or to a point that intersects the setback line defined in Section 4A.404. Buildings or structures may be placed a minimum of 10 feet from all other perimeter lot lines or 30 feet from a street line if the lot upon which the building or structure is to be located was in existence prior to October 26, 1993. The benefit of this exemption is available to lots which already had buildings or structures located thereon prior to October 26, 1993. You can expand a building along those lines but you cannot go beyond the setbacks required by the Town. For example, an L-shaped

$R \times P$

1,538

building, where you could corner it off, square it off, staying within the general shape of the building, but further exempt expansions shall not exceed the height of the part of the existing structure/building being expanded except where the expansion is outside the current setback and the height is otherwise allowed by zoning. We allow some exemptions, for example a porch expansion with an existing 10 foot setback from the street whereas 20 feet is now allowed. The porch could then be built 10 feet back, but it could not exceed the height allowance. In Dartmouth, we have a maximum height allowance for all buildings or freestanding structures of 35 feet.

Mrs Silva:    It went up right where the porch used to be, where that foundation now is, used to be the first step onto the porch . Basically where that foundation is, was a porch. The foundation is gone, the new foundation has been included. And the porch couldn't have been one floor high, but it's not.

Mr. Perry:    One floor high, whatever that (inaudible) continues right along the front of the lot, that would've been okay, but the minute you start (inaudible) it up, it goes...

Mrs. Silva:    It goes right up...

Mr. Perry:    It then goes to the Board of Appeals. or (inaudible).

Mr. Birknes:    There is a ten foot extension. Section 5.404 setback requirement says, in addition buildings or structures may be placed a minimum of ten feet from all other perimeter lot lines or 30 feet from a street line if the lot upon which the building or structure is to be located was in existence prior to October 26, 1992, (inaudible), and then it repeats that again. The benefit of this extension is available to lots which already had buildings or structures thereon, prior to October 26, 1993. The developer, given the benefit of the doubt, could have 10 foot side railings (..Inaudible...) from Arch Street.

Mrs. Silva:    Mr. Gonsalves, were you going to say something?

Gonsalves:    No, after Mr. Silveira, I have something.

Mr. Silva:    Okay, Mr. Silveira, we're going to give you an opportunity...

Mr. Silveira:    Number one, that section, we're talking about a general residence district here. The current setback requirements in that district are now 20 feet all the way around. We used to have (inaudible) 30 rear yard and so forth, and a whole bunch of things going on over the years. That section on exemptions, as I recall, after that Town Meeting, wasn't supposed to be in the bylaw. It got on the warrant, as I recall talking to Mr. Perry about it at the time, it was his understanding (inaudible) because we had a problem with it because it says 30 feet. Exempt at 30 feet doesn't make any sense. We put in a new bylaw and went to Town Meeting. Town Meeting approved it. The

Attorney General approved it. It was the bylaw. It makes no sense. Why do you have a contradictory exemption when the bylaw exists that I can have a 20-foot setback. Why do I want an exemption that says only 30 feet? Number One. Number Two. That's not the only part of the bylaw that was enacted at that time. We have section number 3B, Non-conforming uses in structures and lots. And in 3B.104 Substantial change of use for one or two family residence (inaudible). Existing one and two family residential uses, which are non-conforming uses, may be altered without a special permit from the Board of Appeals, if the expansion or alteration meets the setback height and lot coverage standards of the governing district in which it is located. In reality, the plans were approved and the ramifications will be interesting. There is a problem interpreting the bylaws and certainly, hiring Attorney Bobrowski was good. I cannot keep guessing at the rules.

Silveira:      (inaudible) same thing, except the special permit may be granted, so, we also have expansions or alterations and non-conforming uses are allowed. Non-conforming lots are allowed in accordance with the 3B.101 (inaudible). There's a whole section in here you have to choose from a. b, or c. Certainly when this first came out as confusing as it all is to you, it was just as confusing to us. You do recall helping me Mr. Town Counsel and we discussed this.

Birknes:      It is confusing, I'm not criticizing the Building Department because we make mistakes. I make them myself. But, to me, I'm sorry we didn't discuss this one first, but we didn't.

Mr. Perry:     Quite frankly, hiring Mark Bobrowski was an unfortunate travesty and expense of 30,000 dollars. There are no other bylaws in the Commonwealth that are clearer than Dartmouth's. You are hearing it from one side. When you read this it is black and white, exempt expansion shall not be within 5 feet of the property line. It could not be made any clearer. I don't think Mark Bobrowski or any other attorney could write it any clearer?

Silveira:      I think it's clear that we've got some important work to do on the bylaws (inaudible).

Mr. Perry:     Dave, I think it's very clear, the Town of Dartmouth has very good bylaws. Our zoning bylaws are not a major problem, it's a matter of looking at them a little more closely. I understand they are complicated and Mr. Silveira has a lot work to do. Perhaps a checklist would help.

Silveira:      I know that. That's why I think it's so confusing. What disturbs me the most is that rear structure. That residential structure...

Birknes:      That residential structure being cut off and then allowed to stay there.

Mrs. Silva:    Well, it wasn't allowed by ZBA. Just before we go much further. Everybody's been

EX D      1540

reading these bylaws where they state setbacks will be 30, worst case scenario, now 20, and if the law existed before 1993, maybe 10.

Mr. Perry:       On the side..

Mrs. Silva:      Nothing about the front...

Birknes:         It's either 20 or 30.

Mrs. Silva:      20 or 30... Where does this conform?

Silveira:        (inaudible)

Mr. Carney:      There is no footprint.

Mrs. Silva:      The original footprint...that front wall of that foundation would have been a one-story high porch, not a three story wall of the main building. It would have only been a porch. So, I don't know how big is the porch? 5 feet? The depth of a porch would be 5, 4 feet, 6 feet, whatever, and then the house began.

Mr. Carney:      Did they enlarge the footprint from the old house?

Mrs. Silva:      As a living expansion, yeah.

Birknes:         Let me clarify this further. Dave referred to the Goldbush case, which is (inaudible) talking about rebuilding the footprint. (Inaudible) But, the way I read that case, what they're saying is you can't just go up on the same footprint, because it's now non-conforming without getting some relief. Whether the addition of a second level in this case being the carriage house which was (inaudible) with the side lot, as it should have been, that intensified the non-conformity, that they narrowed as much as determined by the Board. (Inaudible) Unless that report (inaudible), you don't magically say you can go up to the maximum building height for a non-conforming residential dwelling (inaudible). It still might require relief. If you think about it for a minute, this Cape, 4 feet from the lot line with the neighbor (inaudible). If you're going to say that somebody that is now non-conforming should be 10 or 20 feet back by today's standards, and we have, a small story and a half cape, all of a sudden he's going to go up two stories to 35 feet, what does that do to the neighbor when he's 4 feet away? That (inaudible) the non-conformity as it effects the neighbor. That is what I mean (inaudible). You've go to be (inaudible) and you've got to be cognizant of the fact , then you make a bad situation worse, as it stands, (inaudible) so the footprint does not (inaudible).

Silveira:        Number one. Two items you raised. Certainly the back building (inaudible) was a concern was attached to the house (inaudible) was supposed to be attached to the

Ex D

154

house. As permitted, it was intended to be attached to the house the same way it was previously. We have the plans right there. That's number one. That's the (inaudible) attached building, we currently allowed those in any case, when you build a house (inaudible) because you're building an additional building separate from the house (inaudible) which requires a special permit, if it's not attached. So, I think that issue is moot. Back to the original house, though, certainly we're talking, Mr. Birknes is talking about the neighbor's concern. If, in fact, for conversation's sake, I still am not giving up on my point at this point, if, in fact, he had moved back 20 feet from the street, and he had moved in 10 feet from the sideline, would he had been able to go up 35 feet anyhow? In my mind, my answer is yes.

Birknes:    Yes. Not going up on the 20 or 30 feet, but assuming the 20 feet is okay...

Carney:    Take the size of the lot into consideration you could have never gone back that far.

Birknes:    I've have another point. You can't dismiss that rear building by saying you can rebuild part of it, not the rest. In other words, you're allowing that other non-conformity to exist just as you're allowing the non-conformity in the front yard, you're allowing the non-conformity in the front yard, you're allowing the non-conformity in the rear yard to continue. When the mandate is that once you start tearing down or altering or rebuilding, that you should be conforming to present-day setbacks.

Silveira:    But, in essence, if they left the front wall of the house as is (inaudible)...

Birknes:    If they left the old house there and gone along lot lines (inaudible) then it would have been fine, but they didn't do that.

Silveira:    As the one wall theory goes, they left the building in the back which is a part of the main house. It hasn't changed. They do that...

Mrs. Silva:    It did change. It's all closed in as a separate property. The only thing that would attach it to the house would be the stairway to heaven, that they had sticking out of the back end of the house to make it conform. And that was acceptable?

Silveira:    That was acceptable, yes!

Mrs. Silva:    If you just make a stairway from your main house to the back shed..

Silveira:    I would refer you to the house on Mason Street that's created an apartment over the garage and connected the garage which is 30 or 40 feet away by a covered walkway with a set of stairs that were covered.

Mrs. Silva:    I know where you mean, on the corner of Howland Street. Another hideous thing,

EX D    1540

yes.

| | |
|---|---|
| Silveira: | Exactly. |

Gonsalves: But that's the one that set the precedent that gave the (inaudible) to this. But there's still an issue that you're not answering, and that is in going up on the back side, on Geraldine Frate's side.

Silveira: Going up?

Gonsalves: Yes, going up. In increasing the height of the building.

Silveira: Which building are you talking about?

Gonsalves: What used to be the studio, which, in going up there and in putting the door and stairway down onto the stone wall which is the property line.

Silveira: There's always been a stairway in between there.

Gonsalves: No, there wasn't. There was a door when he did the remodeling out there, there was a door that opened out into emptiness because it was right over the property line. Subsequent to that, because he needed another access, he put a deck there, or an entry way and stairs down that ended up coming down on top of the stone wall which belong, which is the property line between that property and Geraldine Frates' property. The back yard.

Silveira: Mr. Gonsalves, I respectfully disagree. I believe it is (inaudible). We saw the property and we viewed the property, we had further difficulty with this gentleman and we went out to look at it.

Carney: I recollect that there was some stairway there.

Gonsalves: The fact of the matter is, Madam Chair, the issue is at this point, which this Board has made and administrative appeal to the Board of Appeals which (inaudible). The question is doing that, do we have withing the zoning bylaws, enough of a clear instance to prohibit this type of thing, and apparently, you believe that we don't.

Silveira: No. I have to tell you that certainly the Town Counsel is here taking notes and I don't know who is going to (inaudible) who in this building (inaudible), but the reality is here, after numerous discussions with Town Counsel on these matters, the end result was that we allowed this permits. Now are we to take Town Counsel at his word and his advice, or are we to question everything and go to a second counsel for reassurance? I have done that of late. I will be perfectly honest with this Board, because I should (inaudible) and the fact of the matter is we have been going under

EX D

1543

the guise of Town Counsel since 1989, 88, when the bylaws have changed because of concern with them and we have proceeded on his advice. If we decide it's incorrect, then we've got a problem.

Gonsalves:    We just heard, not only from Town Counsel, but also from the Town Planner, of the misuse. I heard at least three instances in the bylaws, in the zoning bylaw, at least three instances in which there are violations here. I don't know about if there are violations (inaudible) but I know in at least 3 instances in which there are violations here. So we're not just talking about Town Counsel, we're talking about Town Counsel and the Town Planner.

Silveira:    The Town Planner is not the administrative authority, number one, he's just an advisor. Number two, Town Counsel certainly is entitled to change his mind. Unfortunately, I am bound by earlier advice until that information is brought to me.

Birknes:    I don't want to get into an argument about Town Counsel...

Silveira:    I don't either, John.

Birknes:    I prefer to put things in writing just for that reason. I don't say I'm infallible any more than any one of them. I don't say either but I take responsibility for any of those things.

Silveira:    That would be a matter certainly for court to determine, because I think between (inaudible) and myself having done this for the past 4 years or so, based on that advice we would have to say that that was the advice we were given. I can't speak with great detail (inaudible), but I'm sure at some point you will have to (inaudible) The reality here is , that based upon what we were told, what we should be doing, what we shouldn't be doing, you have before you a set of plans that were approved. Now whether this Board wants to proceed with this administrative appeal is certainly up to this Board and it has every right to do so. The ramifications here? It's going to be interesting. Definitely going to be interesting. And I suspect we did this in the best interest of the town and the best information we could gather to allow this thing to be built. So, saying that, I don't know where we go from here. I can clearly see total instances where certainly the bylaw having been exercised for the past four year, you do recognize problems. Interpretation certainly is one of them. And certainly the board recognized that when it hired Mr. Bobrowski, and that was a few years ago, I believe. In that time, where is any help in rewriting the zoning bylaws? I've asked for that to happen since almost the day I started working for the Town. We've got parts, we've got pieces, we've gotten starts and stops and we got (inaudible) . If we're directed, it will certainly tell us what we have to do and we'll certainly change that direction and I have no problem doing that, but I can't keep guessing at the rules. I have to be consistent, I've been consistent, Mr. Reed has been consistent, and that consistency has been based on the facts that we've been

given to us by the authority (inaudible). What more than that I can do, I don't know. I do know that if this goes any further, there's going to be an interesting conversation on how it all took place. I know that. You know that. And, is this the one we would correct right here and now? Maybe, maybe not. But the reality is, is that we have a disagreement here, and I'm not sure how the resolution's going to end.

Mr. Perry:    Madam Chair, may I?

Mrs. Silva:    Yes, Donald.

Mr. Perry:    I have to, again, and I stress both again, and I've said publically, many times,

**END OF FIRST TAPE**

Birknes:    Our by-laws do leave something to be desired and are unnecessarily voluminous. Just take a look at sections 484B (inaudible) why they have to repeat all that verbiage (inaudible). Also, we have some items in there that absolutely should require revision. The law changes, the law evolves and this is another complication. While Dave and I have been talking, we've had major changes like checkerboarding blocks that need to be repeatedly done. in subdivisions, (inaudible) which is very difficult for the Building Department to determine, whether a lot, can now be built in Town or because its been in a single separate ownership for a period of time when the courts now said well, you can't put it in the sister's name or the son's name and the Building Inspector finds out about that (inaudible). The Goldbush case that I cited to you, before that came down, it was generally thought that if you did something with a footprint, you were all set! Up until that case came down, you were. You could go, get a permit, go right up to 35 feet - bam! That's not so anymore. Things have changed. I have given Dave advice from way back, (inaudible) and his predecessor and his predecessor before that. I suspect that some of my early advice was just standard (inaudible...) by the way of it going ahead until a complaint issued, that's what I suspect happened here. This one, I think was a problem and we should have sat down beforehand to discuss the issue. My opinion is it's a mistake and in my opinion, there's a duty here and I believe that it's a mistake with the duty (inaudible).

Mrs. Silva:    Can I ask a question? When is re-construction changed over to new construction? What is the definition?

Birknes:    I preceded my remarks by saying that we ought to look at interpretation. You could easily interpret that and say that this is not an alteration or expansion. There was a part apparently that was left on there, part of the structure...

Mrs. Silva:    Oh, the shed...

Ex D    1545

Birknes:     You can make those kinds of distinctions. Bearing in mind that you always try to (Inaudible) with a developer, a builder, a homeowner (inaudible), at the time (inaudible) and if there's a loophole, or if there's another interpretation that will benefit them, they will try to make it and try to convince you, and many times you're convinced.

Gonsalves:   Is there an issue of abandonment here? when the request came before this board to discontinue the gas line which rendered what was left of the structure, by that time I think it was only the foundation, uninhabited because they tore out the gas line and all the utilities that service that, so it rendered that property unlivable because I think the individual who was living in that back structure had to leave that back structure because there was no longer any services. Does that constitute abandonment and if in fact it does constitute abandonment of the property, does that change the...?

Birknes:     Assuming that's true, it's still the property by the lot that's pre-existing that was a singular lot, standing alone and at worst case, you would have the exemptions we talked about...

Gonsalves:   And the opportunity for relief from the Board of Appeals?

Birknes:     Oh, yeah, you always have that. But I mean if you didn't want to go there, you could always argue we have a pre-existing lot prior to 1993 and we had a structure on it and so now we want, as with this case, alter (inaudible...)

Gonsalves:   The Board of Selectmen received a letter from Mrs. Geraldine Frates, an owner of abutting property which was a copy of the letter that I (inaudible), asking for explanation on a number of issues. I received a copy of that letter along with the rest of the Board members. On the basis of that letter, the Board voted to ask Mr. Silveira to respond to Mrs. Frates' letter. Mrs. Frates called me three days ago. She'd returned from vacation, she had been on vacation, she returned from vacation, and her question to me was what was happening on this, she had not as yet received any answer on any of the questions she had asked for. Should that be the Building Commissioner answering those questions or should that be something that awaits an answer from the Board of Appeals on the administrative appeal?

Birknes:     Well, obviously, she should have an answer if she directs her question to the Building Commissioner, Zoning Enforcement Officer, then it's mandated to get him to respond.

Silveira:    And the answer is me again, 14 days. And I got this message from counselor Birknes...

Gonsalves:   What, responding within 14 days?

$Ex \ D$

$1546$

Silveira:  (inaudible) In 14 days, ... There is no dealing of punishment according to the laws for the lack of response within 14 days. Once that 14 days was intended to do was to give the Commissioner at least 14 days to respond without any pressure, push, or bullying, or any other situation, if he chooses not to respond, he doesn't have to, he may not think a response is appropriate, it may be that the applicant should take the matter to the Board of Appeals, where it can be heard up front. I have a number of cases, that's been done. The reality here, I haven't responded, No. The other reality here, I need some time. You've got an order out there, comp-time is to be kept to a minimum. Certainly Mr. Gagne has been very generous, but the thing is here you are limited through the course of the day when people can work. I can certainly compose a letter, but it should be typed in proper form and sent out on proper letterhead and those clerks are up to their ears in work now. Send it to somebody else — everybody is up to their ears in work. Get a clerk in and the floater, it's tough to get anyone. So what are we supposed to do? Okay, I didn't respond. There's no punishment involved. It's an administrative function that building commissioners do.

Birknes:  It's true that the statute doesn't call for sanctions for failure to comply, but the statute, in my opinion, mandates a reply.

Silveira:  I beg to differ with Town Counsel on that, I certainly...

Birknes:  It doesn't say the Commissioner may (inaudible) I can understand (inaudible) that there are no sanctions but a slap on the wrist, but go a step further than that, if there is going to be any liability next time and I stop explaining that there is, if there is, the violation of the statute is the first step to finding fault. So there is some significance, Here.

Mr. Perry:  The town bylaw clearly states that any person who makes a request in writing, the zoning officer shall make a determination (inaudible), the zoning enforcement officer **shall** respond to such request within 14 days. That's a zoning law.

Vincent:  Can I ask a question? Maybe I'm wrong. I hear what the statute says, I hear what Mr. Perry says, but there was one other thing and maybe we're not important, but that letter was brought to our attention -- each and every one of us received that letter and at a Board meeting we voted **unanimously** through the Executive Administrator, to order you that we wanted that letter responded to. So are we right saying that because of that, we're bullying, are we bullying or do we have, you know we have to answer to our people that vote us into office too, this lady wanted an answer. Through a vote that was taken unanimously, 5 to nothing, ordered the Executive Administrator to tell you to answer this letter, and I'm hearing that you don't want to answer the letter. Where do we stand David?

Silveira:  Mr. Vincent, I tried to explain. Two things— I issued the wrong table. Yes, this

subject may be important to Mrs. Frates, but there are a lot of issues out there that are just as important to other people. Certainly we have a whole town full of issues to deal with. Certainly, they are important, but it's not that I disregarded it, it's just that in the course of the day around here, it's **impossible** to get to everything!

Vincent:   But where does the priorities come, David? I'm not trying to be a wise guy...

Silveira:   Mr. Vincent, I understand you're not trying to be a wise guy. I'm not trying to be a wise guy either. The priorities here seem to be in the direction where the loudest wheel gets the grease. I understand what that is. I understand what that is. I understand the full ramifications of what that is. But some of the quiet wheels have rights as well and some of those time lines are just as important and we're looking at some serious deficiencies of help. We decided that my office shouldn't have another regular clerk full-time. So what does that do to my office? It puts a lot of pressure on a lot of things. We decided that I can spend more time in the office talking to people at the counter, answering the phone, and doing all of those things. Finding time to write a letter is really, really, really tough. There are a number of attorneys out there who want a response, some for about a year.

Vincent:   David, please, please, I don't want to get into this and I don't want to start. David, please, the last thing you want me do is to say that I'm going to have to have somebody go with each and every one of your inspectors and with you for an 8-hour day and you're going to tell me, you're going to tell me, sitting here, and I'm glad it's behind closed doors, that our directive order from the Executive Administrator from the Board of Selectmen, that you can't find time to write a letter and answer that lady? I find it hard to believe, David, and I'm telling you that right to your face. That's my honest opinion.

Silveira:   Thank you Mr. Vincent. And I appreciate that.

Vincent:   You know me, if I have something to say, I say it right here. And that's my honest opinion. No one is going to tell me, you may tell everybody else, that Joel or any of your inspectors are going to tell me that from the time they come in here and the time that they finish, that they are working all the time - 8 hours - don't tell me that please. Don't embarrass me. And that's all I'm going to say. I'm out on the town, I go around and I have eyes. Please. You want to tell the public that, fine. Don't tell me. And that's all I'm saying. I get offended when people send me letters, I expect them to get answered, and when this Board takes a vote and he is given a direct order and I hear you say to me, you don't have the time and you're not going to answer it, it hurts me, David, because now, what am I supposed to say to this lady, this lady is going to say, You're his boss and he doesn't want to listen. What the hell kind of boss are you? You guys are no bosses, you're just rubber stamps. You just get voted in and that's all you are. You're a figure head up there! That's all you are. You don't get any respect, you don't demand any respect, and you can't get anything

Ex D

1548

done. Well I don't like to hear that David, it's not fair.

Silveira:   If I may, I hear your concerns. But my concern is equal to yours, I think. Certainly we want to be out there and do the things that we can do. Certainly, people don't work to 100% in any department in this Town. What I'm saying is certainly, to place the blame on that, you want to start looking around. With that said, you know we've had some discussions on certain issues and you have gotten some very prompt responses.

Vincent:   That's correct, and I'm not saying I haven't.

Silveira:   Okay, I want that on the record as well. But certainly this is one issue. This is certainly at the forefront to draw into a meeting like this. This is certainly important. I asked for this meeting.

Vincent:   That's right, and why did you ask for it? I said instead of he said, I said, I asked you here to look each other in the eye.

Silveira:   And you agreed.

Vincent:   And I agreed. That's the way it should be.

Silveira:   That's why we're here. And as I said, everybody has an important item on their agenda, everybody does. There's not one person in this room that doesn't! And my items are no more, no less important than anybody else. Do I respect this Board? Without a doubt! Without a doubt! You folks are voted in by the Town to represent their best interests and you through whoever, have hired us to represent the town and support the policies you would like to see implemented. This issue here, as I'm trying to tell you, is just one issue, okay? We're trying to report them all. We're trying to tell you everything that's going on. We're trying to be responsive to everybody. We've got an issue on Stackhouse Street, **that won't let go!** There is nothing wrong with Stackhouse Street that isn't being addressed, but I've been called out on that issue 3 or 4 times in the last week. Much less reviewing files and talking to people on the phone, staff included. Is that issue any less important than this? No. Did I find out new information on a complainant? Oh, I've got stuff on his now! By accident, but I've got it! Okay. The complainant is not virgin. I'm going to do the best I can with these bylaws. I am here to tell you that irrespective and with all due respect to Town Planner, the bylaws stink! Okay, bottom line. Piecing together since 1964. A piece at a time here, a piece at a time there, we've tried it all kinds of different ways. I'm here to tell you - on the record - in front of all these good folks - **they stink!**

Vincent:   And I respect your opinion.

$Ex D$

$1549$

Silveira:     Alright. With that said, what can I do here to help make this right?

Vincent:     The things I feel that you could help to do it right, this is my opinion again, is that I feel that somewhere along the line, when a directive is coming from the Executive Administrator, from the people that hire you, that somewhere along the line, the priorities have to say, Geesh, my bosses have stated that they want this letter answered, then everything else has to take a second place and answer the letter.

Silveira:     If I can, If I can. I'm telling Mr. Reed every day, if we got to plant petunias, then that's what we do. And I didn't say I wouldn't respond. We're talking about the bylaw, and my understanding of that statute.

Vincent:     But, I heard you say you weren't going to respond. I heard that here.

Silveira:     Yes, okay. You might have heard that. I might have ...

Vincent:     So that's what I'm saying. We've taken a vote. We've asked Michael to tell you and then, what you're in essence saying is I don't care what you guys voted, I'm not going to answer the letter. That's what I'm hearing!

Silveira:     I think what I was trying to say if I may correct this a little bit, and what I said is I haven't had time to get to the letter. Not that I don't have to. We were talking about the statute, and my understanding of the statute, okay? I think that got confused with the fact that I'm not going to answer the letter. What I think I said, more correctly, was, I don't have to. And that's where Town Counsel and Mr. Perry came in and offered their advice.

Vincent:     And I heard that.

Silveira:     Okay, given that, it's not that I don't intend to answer anybody's letter, but I got a stack of letters to write. Okay. Is Mr. Gagne due respect to his office? Certainly. He asked me to write the letter. It's on my agenda to do, certainly.

Vincent:     But where does the priority come David when a directive comes down, and again, I'm not trying to beat a dead horse. Where does the priority come to you and to your office when it comes down from the Executive Administrator from a vote taken by, not one member of the Board, now this isn't a power struggle, this is by five members to say, hey, this lady is on our back. She sent us all letters. We want an answer given to this lady, and get you to say, it's when you feel you're going to find the time and you're going to set the tone or you're going to do it like it's just avoiding what directive has been sent down through the Board. It's like we have to answer to you, not you answer to us, and I'm confused.

Silveira:     I'm sorry that that's the case, because that's all I intend...

EX )

1550

Vincent:     Because Mr. Gonsalves just said up until 3 days ago, this lady hasn't heard a word from you.

Silveira:    That is correct, I haven't written the letter.

Mr. Reed:    I think there was maybe some misunderstanding there. David will get the letter done tomorrow. Get the letter out tomorrow, Dave.

Mrs. Silva:  But why do we have to come to this point?

Mr. Reed:    Just hold on a second. You've got to understand. You're right about some of the comments you've made. The thing is right now for the past, probably two to three weeks, we've been getting bombarded by Stackhouse Street, this one, the horse barn up on Smith Neck Road. I mean they're coming at us from all angles, and I think there really was a mis-communication here and your understanding of the zoning bylaws (inaudible).

Vincent:     I can respect that Joel. Getting back to, I know as one member of this Board, I've been on for 9 years, I believe every time David has come before this Board of Selectmen and he reviewed his budget and everything, and I always ask, do you feel you have enough personnel down there? Do you need another inspector? Do you need another person? So I'm saying that if I've always asked the question, if you need?, and it's always been no, I think we have sufficient, then it's kind of difficult when I hear you say what you had to say here, then I have trouble biting it because I'm always asking you.

Silveira:    I understand, Mr. Vincent. And certainly in the past, in an effort to be conservative, and be as frugal as I can, I have not asked. This year's budget we haven't reviewed yet. I've put a request in here that very clearly states that we're going to have a problem with the staff we have in place, plus the shortage, because the staff we have in place are going to break down. There's no question. We have enough work for four times the inspectors. I prepared myself our amount of work, dollar value, would stand alone, because I haven't had the report in yet. And we do 5 times the work that a 9 million dollar budget provides. We do 5 times the work per dollar value per inspector. We have a town here, there are 3 in the state that are huge. Middleboro, Plymouth and we're the third. We're equal to 3 towns just simply in area. Simply in that. The number of people who have an interest in this community is unbelievable. We're getting calls from Texas, and who knows where and this, that and the other thing and how do you handle this. We've got people coming in the door, just dropping in, oh, is Mr. Silveira there? Could I ask him a few questions, we're thinking of putting a building up on Faunce Corner Road. I've got to check this. Can you spend a few minutes with me. What am I going to tell them? Go away, come back in a few weeks. The guy has traveled a thousand miles to get here. Bottom line is in this year's budget you will see a comment regarding staff. I think

$EX$    |55|

if you talk to the staff individually, you'll hear the same thing. We are very disappointed in the fact that that Clerk is missing. Bottom line is, Yeah, I'm responsible, I'm the guy, I'll take the heat. You certainly do what you need to do as far as I'm concerned because I know the things that we have done, to continue to the best of our ability, with what we have to work with, and if there's been any feeling that the board feels I have been inappropriate, than I apologize. That's not me.

Birknes:    Let me read to you just a couple of sentences, I gave you a couple of extras, to let you know that other people have similar types of problems. In October of 1995, Nextel applied to the Franklin Building Commissioner for a building permit to construct a communications tower .... Two weeks later the commissioner issued this. On August 14, 1996, 3 months after the tower was erected, the building commissioner sent Nextel a letter ordering him to remove both towers, by September 15, 1996. He took this action at the behest of the Franklin Town Counsel and the Town's legislative counsel. In the letter, the building commissioner claimed that the towers violated the height and use restrictions of the Franklin zoning bylaws. And it also mentioned (inaudible) involving the Department of Public Utilities. In mid-September, 1996, Nextel appealed the Building Commissioner's removal order to the Franklin Zoning Board of Appeals. The board held a public hearing in October and on November 14, issued it's findings and the decision stating (inaudible). The permit had ben issued and then determined it was wrong. So you're not alone, it happens all over, because there are problems with interpretation. It's just that I had to take the side which I feel is right. (Inaudible)

Carney:    I feel we have to do something to change that. Buildings like this shouldn't be allowed on those lots, so what can we do to stop this in the future?

Birknes:    You have two issues. One instance, the client has some relief from you, like in Arch Street. The problem that you just said was being addressed, I think, by the re-vamping of the zoning bylaws. I have faith in Mark Bobrowski. And if there's a problem, I'll blame it on the Planning Department.

Carney:    I'm told that the Planning Board is holding this whole thing up because they're going through every....

Mr. Perry:    Mark has been looking these over for the past three months now, he's going to get back to us...

Gonsalves:    The point here is that we've already done what I believe we should do. We've asked for an administrative appeal. We've asked for the quasi-judicial group that oversees all this to render a decision on whether yes, there were zoning violations, or no, there were not zoning violations. At the conclusion of that administrative appeal, then the direction for this board will be clear if anything further is to be done. If in fact the decision by the Board of Appeals indicates that that kind of an issue is allowed or if

EX )    1552

these kind of issues if they are allowed under the zoning bylaws and the feeling of the town is that they should not be, then through the Planning Board, or not, depending on whether depending on whether the planning board agrees or not, we go to town meeting for a change in the zoning bylaws. If in fact the zoning board looks at this and says no, the issue is unclear, and so the building commissioner, in giving these permits, was interpreting the vagaries of the bylaw correctly, then again, we have a very clear direction to follow. If we want to change so it's clear, can we do it? We've heard from the Building Commissioner's prospective, that the zoning bylaw is unclear. It's vague, ambiguous, and it allows for this kind of latitude. We've heard from the Town Planner and Town Counsel that in fact the specific zoning bylaw that has been quoted, does not allow for vagueness. The Board of Appeals has got to determine that. This meeting is not going to determine that. We're not going to determine that. When David says he hasn't got time to do a lot of things. I can understand that. I don't understand why this meeting, and the time that it took to prepare for this meeting, was necessary when the Board of Appeals is going to make the final decision.

Mrs. Silva:    Also, once we have this meeting in place, we are told that tomorrow, they'll make the letter. They could've made the letter and not had this meeting. The letter is not going to be and easy letter to write, but it's got to be something that we address.

Mr. Gagne:    But there is some merit in having this kind of meeting, because you've got counsel, you've got Donald and you've got David that has a different take from the whole thing and I think it's good that the Board hears all of it. I think there is a benefit to it.

Mrs. Silva:    There is benefit to it, but now that we've heard that one of the problems that we were having with it was getting an answer to a taxpayer, to get relief from her concerns, it'll happen almost immediately.

Birknes:    There is one concern here that I think you ought to think about, and that it do you really want to air this on community T.V., or should the building commissioner reconsider and say maybe I should issue the cease and desist if I'm convinced that Town Counsel has some merit to his argument?

Gonsalves:    The building commissioner is not going to issue it, he's already made that very clear.

Birknes:    Maybe he ought to go see Phil Beauregard, or someone that he has more faith in, to get a quick reading on this, and then reconsider, but I think for the Town's interest, you ought to think about this.

Vincent:    The only thing I don't want to see happen and continue to happen is that no matter which way this thing goes, and that's the only thing I want to stop, is supposing, hypothetically, that the zoning board says no, what do you think is going to happen?

EX )
1553

What do you think this builder's going to do? Do you think this builder's going to say, Oh, that's okay? No. We're going to be faced with a lawsuit. So John, all I'm trying to say is what I want to come out of this is something that's going to be a benefit to everybody so that if something like this comes up again, that the powers that be, the building inspector, the planning board, town counsel, get together and say, hey, what are we going to do with this? Let's make a decision and if it comes 2 to 1 then it gets granted, or 2 to 1 that it doesn't get granted, I'd rather see that than this happen and here we are here and we got to go to the ZBA, and it's already constructed and then what happens, somebody is going to get sued. I don't want to see that!

Birknes:     To uphold the building commissioner, the zoning board of appeals has to have a unanimous vote, so one vote says he wrong, he's wrong. In other words, two votes says he's right. They were in a situation where time has gone by at least two months. Then, your builder can have his shot. (Inaudible) You're not listening to what I'm saying, I don't think you are.(inaudible) On the other hand, you can be on the same page, and the building commissioner would issue a cease and desist, and the matter that would be aired from a different perspective that Mr. Silveira.

Vincent:     I don't have a problem with what you're saying there John, what I'm saying is that in the future, a situation of this magnitude comes before Mr. Silveira again. Why is it even getting erected? I don't want to go back to this again. Is it the right thing to do to maybe David, you, and you, and the three of you sit down when the permit comes in and you go over it. Rather than let it get erected, and then there's a difference of opinion between you, between him and now the bottom line is it's going to go to the ZBA, but now, in the meantime, it's erected and we're right back to where we started. Why do we want to do that? I thing what we want to do is to add meetings so that we can come up with constructive ideas to make it easier for everybody, so what we don't have to duplicate, what we're just doing here tonight.

Gagne:       I think maybe to shed a little light on this, Dave and I have been working on an issue that I think addresses this, is that any request for zoning determinations now, he's forwarding up to Shauna and to Donald, and they're spending some time on it, going over it. But then what's going to happen is that they give something that David feels is an error, or incorrect and he doesn't agree with it, they're going to bring it to my attention and then we're going to ship it to John so that John can intercede on the difference of opinion. If it comes out of Shauna and Donald and Dave is fine with it, then we're going to issue the decision, but when it's a split, then in fact, I'm going to intercede with John coming into it. We've spent quite a bit of time on this particular issue as of late.

Vincent:     I feel comfortable with this going...

Silveira:    If I may, since Mr. Gagné and I have accommodated time each morning to discuss

EX7
554

issues that come up, a number of issues have been avoided, I certainly have been unable to deal with in the past. (Inaudible) I think as we all know, everybody's busy and I know it's very difficult to find time to make those morning meetings, sometimes they're afternoon meetings, but I think when we do make them, we're able to share information. We're able to pass things along and to the right authorities. Typically, we had one, how do I donate land to the Natural Resources Trust? He came to my office. I took him from there to Mr. Gagné's. We helped him. We're doing it. It's not a question. I think the difference of opinion in this particular issue here has brought some focus to the fact that we **have** issues, that we need to address, that I think you sense my frustration. You know, I need some guidance here. If it's an issue that needs to take precedence over all other things, so be it. If it's something that we can deal with this in the course of a day, it may take a while to deal with. So be it. But understand that we're trying to prioritize everything from 500 dollars, industrial building, to 5 million dollar houses. We've got another issue coming up very shortly. We've got a house in Apponagansett Bay, on the inner island, that's on small lot. It's going to be a 3 or 4 million dollar house. That will be a problem, without direction. Okay? This could possibly be something in the Town that actually is going to pay it's way in taxes. The direction here is very important, and certainly the support of this Board is important. We not here to blatantly, knowingly make mistakes and errors (inaudible), but on the other hand, we are all human.

Mrs. Silva:    Okay, does the board have any other questions of Mr. Silveira, or Mr. Perry, or Town Counsel? Hearing none. Thank you very much and we'll say good night.

Silveira:    Thank you.

Vincent:    I'm sorry I lost my cool.

Mrs. Silva:    That's okay. Somebody had to say something.

Mr. Miller:    I didn't want to say a word. I know what I was going to say. It's gone on too long, I've had enough. If we could recapture that and put that on film and listen to that again - let's show that to the public! I can't write a letter, I and my staff are too busy.

Mrs. Silva:    I'm overwhelmed...I'm overwhelmed is all he's saying to us.

Mr. Miller:    Too busy to write a letter of importance that we had asked him to write?

Mrs. Silva:    And then, his partner in crime said **we'll write it tomorrow!** Dear God, he said it like he's the boss. He meant to be here.

Mr. Miller:    That was so appropriate when you said that.

EX D

1555

Mrs. Silva:    The whole problem Michael, wouldn't have gone away if they wrote the letter.

Gonsalves:    The time that he took to approach Kenny, to approach Bob, to have this meeting...

Mrs. Silva:    Right, he could've written the letter.

Gonsalves:    Because he sounds like he feels that he's very clear on why they gave this permit. If he's that sure of it there should have been no problem at all...

Vincent:    You know what the sad part is? He's got a problem. Did you see him here? He almost broke down. That's why I back off, because I figure this guys going to go off. It's best to just leave it alone. You know, I'm on the road. Please, please don't go tell me that you don't have time, please, don't even go there.

Miller:    I'm not sure if John is really on top of his game on this one, either. He could have...

Mrs. Silva:    But did he see that? He didn't see that before the permit was issued.

Miller:    No, no.

Vincent:    He saw it after the fact. I think it was after Lenny got involved.

Mrs. Silva:    He said past practice.

Gonsalves:    He said there are others though. He said there are others here and this has been going on for four years, he said.

Mrs. Silva:    At least!

Gonsalves:    And the thing is, that's why I asked Donald to read the zoning bylaw, because it is clear.

Mrs. Siva:    It is clear!

Gonsalves:    There isn't a gray area. It really has nothing to do with this unit or this unit... it has to do with all of them and the precedent is being set and what I'm hearing off the street is not how come this guy is doing it, but I'm hearing on the street is now **I can do it**.

Miller:    Now I'm going to do it .

Gonsalves:    One of them is right on Arnold Street, Frankie Rodrigues.

Vincent:    After all the hell he went through, can you understand why?

Ex D

155b

Miller:          Yeah, the ZBA gave him a lot of trouble.

Gonsalves:       He's getting geared up and there are a whole bunch of others that are getting geared up. For the very reason that if somebody else can do it.... I didn't even dare to bring that up today. I got it the other night by David Mello, but it's not him, it's a friend of his father's I guess, who's called me up a couple of times about Arch Street. Then this lady started to call me up...

Mrs. Silva:      It isn't Geraldine any more, it's the neighborhood. You look at his relatives. Look at Jadlowe's relative on Edgeworth Street is one of those on the list that got permission to increase above the garage for another small apartment for their children to come into. Hardship case. To keep the kids in the Dartmouth High School System, because they were living in New Bedford and coming to Dartmouth schools for band and Sonny Farias' kid, grandkid, and he's got this thing going that's never been finished. It's horrendous. It makes this thing look like a barrel.

Gonsalves:       The thing that they brought up to me was the shingles, the asphalt shingles, and so there's a protocol to dispose of them and they didn't. Not asphalt, asbestos! And they say how come they were allowed to just take that to the transfer station and just dump it? He's asking me. I don't know. I don't know. The thing is that if they can do it, what this guy was saying to me is I got my daughter-in-law's house that's going to need that and I've been worried about how I'm going to do it and now that I see how I can do it. I can just take it to the landfill and get rid of it, and somebody else down the street, there are a number of houses around this street that do has these asbestos shingles.

Gagne:           There is a special way. There is a bagging procedure for handling...

Gonsalves:       The thing is, this is a can of worms and, with all I can gather from David's explosion about Stackhouse...

Vincent:         Yeah, did you hear that?

Gonsalves:       Yes, he believes that I'm... that's me!.

Vincent:         No, no, no.

Gonsalves.       You know that's not me!

Miller:          You know who he's talking about?

Gagne:           Gilly.

Gonsalves:       No, Well, Brian more.

$Ex\ D$

$1557$

Page 24

Mrs. Silva:     Well, the thing is ...

Gonsalves:      That's another case of where there's a long history there that he allowed to go.

Gagne:          But they've also been written up on the parking.  There's that issue there...

Mrs. Silva:     They got a letter from Shauna on that.   If she has a follow up.

Mr. Miller:     It's about time.  I heard she's been sleeping because she's got nothing to do.


END OF THIS PORTION OF THE MEETING.


Transcribed by Mary Ann Ferreira, Assistant Executive Administrator of the Town of Dartmouth.

I, Mary Ann Ferreira, hereby certify that the above is a true record of the Executive Session of the Dartmouth Select Board Meeting held on March 11, 2002, and personally transcribed by me on August 21 - 24, 2003.


_____

Mary Ann Ferreira


Ex D

1558



# DARTMOUTH MASSACHUSETTS

**LEGAL DEPARTMENT**
400 SLOCUM ROAD·P.O. BOX 79399
DARTMOUTH, MA 02747-0985
TEL: (508)910-1881 · FAX: (508)910-1882

**JOSEPH P. HANNON**
TOWN COUNSEL

November 4, 2003

Peter Andrade, Assistant Clerk Magistrate
Superior Court
441 North Main Street
Fall River, MA 02720

RE: Jadlowe v. Dartmouth and Silveira

Dear Peter:

Per your request, enclosed is another copy of the minutes of March 11, 2002, executive session as entered on the record as Exhibit 81.

I have sent a copy to Attorney Fleming and Beauregard with a copy of this letter.

Very truly yours,

Joseph P. Hannon

Enclosure

cc. Donald Fleming, Esquire
    Philip Beauregard, Esquire

RX D
155

DARTMOUTH MASSACHUSETTS

BUILDING DEPARTMENT
400 SLOCUM ROAD • P. O. BOX 79399
DARTMOUTH, MA 02747-0985



**FILE COPY**

TEL: (508) 910-1820 • FAX: (508) 910-1838

*STOP WORK ORDER*



November 24, 2003

Mr. Thomas J. Jadlowe
30 Arch Street
Dartmouth, MA 02748

Re: Zoning Violation Section 5.404

Dear Mr. Jadlowe:

I have received two (2) requests for a zoning determination and enforcement of the zoning by-laws of the Town of Dartmouth. After a review of the building and site plans submitted, I find that because the existing building is no longer there to expand upon, the expansion within twenty (20') feet (current setback) of the front property line is in violation of section 5.404 Setbacks. Therefore, removal of the expanded areas within the current setbacks may be required. Relief could also be granted from the Zoning Board of Appeals in the form of a Special Permit.

Furthermore, even if the existing building was not demolished, it would still need approval from the Zoning Board of Appeals for both the expansion of the front part of the building within five (5') feet of the street property line, and for the part of the roof exceeding the pre-existing height of the existing building within twenty (20') feet of the street property line.

You are hereby ordered to <u>STOP</u> all work until the structure has been brought into compliance or relief has been granted by the Zoning Board of Appeals before you will be allowed to continue.

Per section 27.500, any person aggrieved by a decision of the Zoning Enforcement Officer made under the provisions of the Zoning By-law may appeal that decision under the provision and timelines of M.G.L. Chapter 40A Section 8 and 15.

Respectfully,

Joel S. Reed
Building Inspector &
Asst. Zoning Enforcement Officer
JSR:sbs

D:\SUE\LETTER03\L128157.STW

HAND DELIVERED

**EXHIBIT**



## Trial Court Information Center
Commonwealth of Massachusetts

Home » View Cases » Search Results » Docket Details » Docket Entries » Entry Text

# Jadlowe et al v Dartmouth Town of et al

### Docket Entry Details for Docket: BRCV2002-00480

| No. | Docket Entry: |
|-----|---------------|
| 1 | Plaintiffs' ex parte MOTION to compel stenographer, Jeanne E. |
| 2 | Lentini, to deposit funds - ALLOWED. The subject funds are to be |
| 3 | deposited with the Court within -14- days. (Moses, J.) (Certified |
| 4 | copy mailed to Jeanne E. Lentini on April 9, 2004) |

| Docket Details: | Parties | Attorneys | Docket Entries | Calendar Events |
|---|---|---|---|---|
| | | | | Print Docket |



EXHIBIT
F

JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
_THOMAS JAMES JADLOWE_

## DEFENDANTS
_TOWN OF DARTMOUTH_

**(b)** County of Residence of First Listed Plaintiff _BRISTOL_
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
_DONALD J. FLEMING, LAW OFFICE OF_
_86 CHURCH ST   MATTAPOISETT, MA 0273_

Attorneys (If Known) _Unknown_

_05  10516_

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
_42 USC 1983_
Brief description of cause: _PLAINTIFF HAS BEEN DENIED EQUAL PROTECTION OF LAW IN VIOLATION OF 14TH AMENDMENT_

## VII. REQUESTED IN COMPLAINT:
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $ _700,000_
- CHECK YES only if demanded in complaint:
- JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): _N/A_
JUDGE _____
DOCKET NUMBER _____

DATE _3/18/05_
SIGNATURE OF ATTORNEY OF RECORD _Donald J. Fleming_

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)   _THOMAS  JAMES  JADCOWR  US._
   _____ TOWN  OR  DARTMOOTH_____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

   ☐   I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ☒   II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,     *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

   ☐   III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   ☐   IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   ☐   V.    150, 152, 153.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   _____ NONR_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                         YES ☐      NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

                                                         YES ☐      NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                         YES ☐      NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                         YES ☐      NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                         YES ☒      NO ☐

   A.   If yes, in which division do all of the non-governmental parties reside?

        Eastern Division  ☒          Central Division  ☐          Western Division  ☐

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division  ☐          Central Division  ☐          Western Division  ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

                                                         YES ☐      NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   _DONALD  J.  FLEMING_____

ADDRESS   _86  CHURCH  ST.  MATTAPOISRTT, MA  02739_____

TELEPHONE NO.  _508 - 801- 4011    508  758 - 6580_____

(CategoryForm.wpd - 2/15/05)