UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Docket no. C.A. NO. 05-10516-LTS

THOMAS JAMES JADLOWE

V.

THE TOWN OF DARTMOUTH
LEONARD GONSALVES
MICHAEL J. GAGNE'
DONALD A. PERRY
SCOTT E. SILVIA
JOEL S. REED
JEANNE E. LENTINI

## PLAINTIFF'S RESPONSE TO THE MUNICIPAL DEFENDANT'S RULE 16.1 STATEMENT AND MOTION TO SEVER AND STAY

Plaintiff does not object to the matter being stayed until the title problem can be determined.

Attached is a partial title report. The Plaintiff has in fact twice mortgaged the property which is some evidence if not clear evidence that he in fact does have title to the property. The problem lies in what I describe as a "New Bedford Trust Deed" as show on page 24, that is a deed from the Grandfather to Marc Jadlowe but the Grandfather reserved the right to convey the property free of any interest in Marc which he did by conveying to the Plaintiff in this action. The father then mortgaged the property twice as stated. The United States in its attempt to foreclose the father's interest has not alleged that the father in any way colluded with the son, but simply allege that the Grandfather did not have any title to convey any title to the father.

For these reasons the case should be stayed while that problem is resolved but the Plaintiff would object to a severing of the case as to discovery.

The Plaintiff
By his attorney

Donald J. Fleming, Esq.
86 Church Street
Mattapoisett, MA 02739
BBO# 171460
Tel 508 758 6982 Fax 598 758 3406



# *Bristol County Registry of Deeds*
# *Southern District*
### *J. Mark Treadup, Register of Deeds*

Home | Register's Message | Homestead Act | Directions | Services&Fees | Search | Links

Common Document Detail

| Book: 4453 Page: 216 | Date: 6/30/1999 | Type: QC | Amount: |
|---|---|---|---|

**Town:** DART

**Description:** 30 ARCH ST

**Grantors:**
1    OLIVEIRA, MANUEL C

**Grantees:**
1    OLIVEIRA, MANUEL C
2    JADLOWE, MARC ANTHONY

No Image exists for this document.

Back to Search Form

© 2001 Bristol South Registry of Deeds.

 # **Bristol County Registry of Deeds Southern District**

### *J. Mark Treadup, Register of Deeds*

Home | Register's Message | Homestead Act | Directions | Services&Fees | Search | Links

| Common Document Detail | | | |
|---|---|---|---|
| **Book**: 4773 **Page**: 151 | **Date**: 9/12/2000 | **Type**: QC | **Amount**: |
| **Town**: DART | | | |
| **Description**: ARCH(S) | | | |
| **Grantors:**<br>1    OLIVEIRA, MANUEL C | | | |
| **Grantees:**<br>1    JADLOWE, THOMAS JAMES | | | |
| **View document images** | | | |
| Back to Search Form | | | |

© 2001 Bristol South Registry of Deeds.



# *Bristol County Registry of Deeds*
# *Southern District*
### *J. Mark Treadup, Register of Deeds*

Home | Register's Message | Homestead Act | Directions | Services&Fees | Search | Links

---

| Common Document Detail | | | |
|---|---|---|---|
| **Book: 4890 Page: 10** | **Date: 2/2/2001** | **Type: QC** | **Amount:** |

**Town:** DART

**Description:** 30 ARCH ST

**Grantors:**
  1   JADLOWE, THOMAS JAMES

**Grantees:**
  1   OLIVEIRA, MANUEL C

🖼 **View document images**

[ Back to Search Form ]

© 2001 Bristol South Registry of Deeds.



# *Bristol County Registry of Deeds*
# *Southern District*
### *J. Mark Treadup, Register of Deeds*

**Home | Register's Message | Homestead Act | Directions | Services&Fees | Search | Links**

| Common Document Detail | | | |
|---|---|---|---|
| **Book**: 4926 **Page**: 25 | **Date**: 3/16/2001 | **Type**: QC | **Amount**: 160,000.00 |

**Town**: DART

**Description**: 30 ARCH ST

**Grantors**:
1    OLIVEIRA, MANUEL C

**Grantees**:
1    JADLOWE, THOMAS JAMES

**View document images**

Back to Search Form

© 2001 Bristol South Registry of Deeds.

BK   4773 PG 151
09/12/00 02:12 DOC. 21910
Bristol Co. S.D.

## MASSACHUSETTS QUITCLAIM DEED

I, MANUEL C. OLIVEIRA,

of Dartmouth,                                                          Bristol County, Massachusetts

being unmarried, for consideration paid, and in full consideration of $1.00

grant to THOMAS JAMES JADLOWE,

of 198 Main Street, Fairhaven, Massachusetts 02719

with *quitclaim covenants*

the land, with any buildings thereon, in Dartmouth, Bristol County, Commonwealth of Massachusetts, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, six hundred twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

SOUTHERLY         eighty (80) feet; thence

WESTERLY          one hundred forty and 01/100 (140.01) feet to the east line of Howland
                  Avenue; thence

NORTHERLY         sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY     therein twenty-nine and 23/100 (29.23) feet to said south line of Arch
                  Street; and thence

EASTERLY          therein one hundred forty-five and 93/100 (145.93) feet to the point of
                  beginning.

BEING Lots No. 458, 459, 460 and 461 on Plan of No. 2 of Part of Howland Farm, dated December 28, 1915, filed in the Bristol County (S.D. Registry of Deeds.

FOR TITLE, see deed recorded on June 30, 1999 in Bristol County (S.D.) Registry of Deeds in Book 4453, Page 216.

SUBJECT to the fiscal year 2001 real estate taxes which the grantee assumes and agrees to pay.

TITLE NOT EXAMINED BY THE PREPARER OF THIS DEED.

*WITNESS* my hand and seal this /2^th day of September, 2000.

_Dorothy S. Carralho_                        _Manuel C. Oliveira_
Witness                                        Manuel C. Oliveira

*THE COMMONWEALTH OF MASSACHUSETTS*

Bristol, ss.                                              September /2, 2000

Then personally appeared the above-named Manuel C. Oliveira and acknowledged the foregoing instrument to be his free act and deed, before me,

_Dorothy S. Carralho_
Notary Public

My commission expires: _03/03/01_

Jadlowe partial title
07/04/2006
Page 5 of 27

BK 4890 PG 10
02/02/01 02:10 DOC. 2908
Bristol Co. S.D.

MASSACHUSETTS QUITCLAIM DEED

I, THOMAS JAMES JADLOWE

of Fairhaven                                          Bristol County, Massachusetts,

*being unmarried,* for consideration paid, and in full consideration of One ($1.00) Dollar

grant to Manuel C. Oliveira

at 30 Arch Street, Dartmouth, Massachusetts            **with Quitclaim Covenants**

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

(Description and encumbrances, if any)

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street;  thence

| | |
|---|---|
| SOUTHERLY | Eighty (80) feet;  thence |
| WESTERLY | One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue;  thence |
| NORTHERLY | Sixty-four and 46/100 (64.46) feet to an angle in said Avenue;  thence |
| NORTHEASTERLY | therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street;  and thence |
| EASTERLY | therein One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning. |

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed dated September 12, 2000 and recorded in the Bristol County (S.D.) Registry of Deeds in Book 4773, Page 151.

Subject to the real estate taxes for fiscal year 2001 which the grantee hereby assumes and agrees to pay.

TITLE NOT EXAMINED BY THE PREPARER OF THIS DEED.

. *WITNESS* our hands and seals this 1st day of February, 2001.

_____                    Thomas James Jadlowe

***COMMONWEALTH OF MASSACHUSETTS***

BRISTOL, SS.                                          February 1, 2001

Then personally appeared the above-named Thomas James Jadlowe and acknowledged the foregoing Instrument to be his free act and deed, before me

Jayme A. Thorneond
Notary Public

My Commission Expires: *May 3, 2007*

BK  4926  PG  25
03/16/01 04:03  DOC. 6507
Bristol Co. S.D.

### MASSACHUSETTS QUITCLAIM DEED

I, MANUEL C. OLIVEIRA

of Dartmouth                                                    Bristol County, Massachusetts,

*being unmarried,* for consideration paid, and in full consideration of $160,000.00

grant to Thomas James Jadlowe

at 198 North Main Street, Fairhaven, Massachusetts           **with Quitclaim Covenants**

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, described as follows:

(Description and encumbrances, if any)

### SEE EXHIBIT "A" ATTACHED HERETO



*WITNESS* our hands and seals this 16th    day of March, 2001.

_____           *Manuel C. Oliveira*

_____           _____

### *COMMONWEALTH OF MASSACHUSETTS*

BRISTOL, SS.                                            March  16 , 2001

    Then personally appeared the above-named Manuel C. Oliveira and acknowledged the foregoing instrument to be his free act and deed, before me

Notary Public

My Commission Expires: _10/2/03_

BK  4926 PG  26

### EXHIBIT "A"

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

| | |
|---|---|
| SOUTHERLY | Eighty (80) feet; thence |
| WESTERLY | One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue; thence |
| NORTHERLY | Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence |
| NORTHEASTERLY | therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street; and thence |
| EASTERLY | therein One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning. |

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed dated February 1, 2001 and recorded in the Bristol County (S.D.) Registry of Deeds in Book 4890, Page 10.

Subject to the real estate taxes for fiscal year 2001, which the grantee hereby assumes and agrees to pay.



**Page 1**

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss        Superior Court
No: CV2002-00450        Rule 30 Deposition

THOMAS JAMES JADLOWE &
MARC JADLOWE

vs.

TOWN OF DARTMOUTH &
DAVID SILVEIRA, the Building
Commissioner & Zoning
Enforcement Officer of the
Town of Dartmouth

DEPOSITION OF DAVID SILVEIRA, taken
pursuant to Rule 30 of the Massachusetts Rules of
Civil Procedure on behalf of the Plaintiff, before
Mary Ann C. Escobar, a Notary Public in and for the
State of Massachusetts, at the Town Hall, 400 Slocum
Road, Dartmouth, MA commencing at 10:00 a.m., on
Tuesday, June 18, 2002, pursuant to Notice and
agreement of parties as to the date and time of
taking said deposition.

Goudreau & Grossi Court Reporting Service   (508) 823-465

**Page 2**

APPEARANCES:  Donald Fleming, Esquire
                FLEMING & ISHIHARA
                86 Church Street
                Mattapoisett, MA  02739
                Representing the Plaintiffs

                John A. Birknes, Jr., Esquire
                Town of Dartmouth Town Counsel
                400 Slocum Road
                Dartmouth, MA  02747-0985
                Representing the Defendants

ALSO PRESENT:  Thomas Jadlowe
                Marc Jadlowe

Goudreau & Grossi Court Reporting Service   (508) 823-46

**Page 3**

I N D E X

Direct  Cross  Redirect  Recross

DAVID SILVEIRA

By Mr. Fleming  4          51
By Mr. Birknes      45

E X H I B I T S

Exhibit No.        Description        Page

Exhibit No. 1  Stipulation              4
Exhibit No. 2  Affidavit of Marc Jadlowe    8
Exhibit No 3A  Complaint                9
Exhibit No. 3B  Answer                  9
Exhibit No. 3C  Complaint and Answer    9
Exhibit No. 4  Section 40A              12
Exhibit No. 5  Appeal                   31
Exhibit No. 6  File for 1998 of 30 Arch    42
                Street

Goudreau & Grossi Court Reporting Service   (508) 823-465

**Page 4**

(June 18, 2002
Tuesday, 10:00 a.m.)

DAVID SILVEIRA, a witness called on behalf
of the Plaintiff, having been duly sworn on oath,
deposes and says as follows:
    MR. FLEMING:  Parties have entered into a
stipulation as to the conduct of the deposition and
specifically the parties have waived notice of this
deposition.  The stipulation will be appended to the
deposition as exhibit for identification one.
(Exhibit 1, Stipulation, was marked for
    identification)

DIRECT EXAMINATION

Q  (By Mr. Fleming)  Would you tell us your name,
    please?
A  Yes, my name is David J. Silveira.
Q  And, Mr. Silveira, would you tell us your
    occupation?
A  I am the building commissioner and the zoning
    enforcement officer for the Town of Dartmouth.
Q  And would you tell us your office address?
A  My office is located at 400 Slocum Road, Dartmouth
    Mass.

Goudreau & Grossi Court Reporting Service   (508) 823-46



# *Bristol County Registry of Deeds*
# *Southern District*
### *J. Mark Treadup, Register of Deeds*

**Home  |  Register's Message  |  Homestead Act  |  Directions  |  Services&Fees  |  Search  |  Links**

| Common Document Detail | | | |
|---|---|---|---|
| **Book:** 4890 **Page:** 10 | **Date -** 2/2/2001 | **Type:** QC | **Amount:** |
| **Town:** DART | | | |
| **Description:** 30 ARCH ST | | | |

**Grantors:**
   1    JADLOWE, THOMAS JAMES

**Grantees:**
   1    OLIVEIRA, MANUEL C

**View document images**

Back to Search Form

© 2001 Bristol South Registry of Deeds.

# Bristol South Registry of Deeds   (No Graphics here to save time and ink when printing.)

Home | Register's Message | Homestead Act | Directions | Services&Fees | Search | Links

---

## Common Records Street Search by "ARCH " DART found 59 records

| Previous Page | Next Page | Page 1 of 3 | Back to Search Form |

---

**Description**: 12 ARCH ST LTS 469 & 470 P.B.14 P.35 12 ARCH ST

| **Grantors:** VARGAS, LUCIA M | | | | |
|---|---|---|---|---|
| **Book:** 6421 **Page:** 344 | **Date:** 8/5/2003 | **Town:** DART | **Type:** DOH | **Amount:** |

---

**Description**: 12 ARCH ST LTS 469 & 470 P.B.14 P.35 12 ARCH ST

| **Grantors:** VARGAS, JOSE A / VARGAS, LUCIA M | | **Grantees:** LOANSNAP.COM INC | | |
|---|---|---|---|---|
| **Book:** 7135 **Page:** 43 | **Date:** 8/23/2004 | **Town:** DART | **Type:** M | **Amount:** 93,000.00 |

---

**Description**: 12 ARCH ST LTS 469 & 470 P.B.14 P.35 12 ARCH ST

| **Grantors:** VARGAS, JOSE A / VARGAS, LUCIA M | | **Grantees:** LOANSNAP.COM | | |
|---|---|---|---|---|
| **Book:** 7135 **Page:** 57 | **Date:** 8/23/2004 | **Town:** DART | **Type:** M | **Amount:** |

---

**Description**: 13 ARCH ST REF.3935-141 13 ARCH ST

| **Grantors:** PACHECO, HILDA / FARIA, DONNA | | | | |
|---|---|---|---|---|
| **Book:** 4469 **Page:** 195 | **Date:** 7/21/1999 | **Town:** DART | **Type:** AFFT | **Amount:** |

---

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors:** FARIA, DONNA | | **Grantees:** FARIA, DONNA / FARIA, MANUEL | | |
|---|---|---|---|---|
| **Book:** 4469 **Page:** 197 | **Date:** 7/21/1999 | **Town:** DART | **Type:** QC | **Amount:** |

---

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors:** FARIA, DONNA / FARIA, MANUEL | | **Grantees:** EQUICREDIT CORP OF MASS | | |
|---|---|---|---|---|
| **Book:** 4469 **Page:** 199 | **Date:** 7/21/1999 | **Town:** DART | **Type:** M | **Amount:** 50,000.00 |

---

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors:** | **Grantees:** |
|---|---|

Jadlowe partial title
07/04/2006
Page 14 of 27

| FARIA, DONNA<br>FARIA, MANUEL | | FARIA, DONNA<br>FARIA, MANUEL A<br>FARIA FAMILY REALTY TRUST | | |
|---|---|---|---|---|
| **Book**: 4545 **Page**: 26 | **Date**: 10/26/1999 | **Town**: DART | **Type**: QC | **Amount**: |

| **Description**: 13 ARCH ST 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | **Grantees**:<br>MORTGAGE LENDERS NETWORK USA INC | | |
| **Book**: 4614 **Page**: 116 | **Date**: 2/2/2000 | **Town**: DART | **Type**: M | **Amount**: |

| **Description**: 13 ARCH ST 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, MANUEL A<br>FARIA, MANUAL A<br>FARIA, DONNA | | **Grantees**:<br>AMERIQUEST MORTGAGE CO | | |
| **Book**: 4654 **Page**: 28 | **Date**: 4/5/2000 | **Town**: DART | **Type**: M | **Amount**: 95,200.00 |

| **Description**: 13 ARCH ST 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | **Grantees**:<br>HOUSEHOLD FINANCE CORP II | | |
| **Book**: 4753 **Page**: 26 | **Date**: 8/15/2000 | **Town**: DART | **Type**: M | **Amount**: 141,834.91 |

| **Description**: 13 ARCH ST 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | **Grantees**:<br>HOUSEHOLD FINANCE CORP II | | |
| **Book**: 4754 **Page**: 16 | **Date**: 8/16/2000 | **Town**: DART | **Type**: M | **Amount**: |

| **Description**: 13 ARCH ST 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A<br>FARIA FAMILY REALTY TRUST | | **Grantees**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | |
| **Book**: 5619 **Page**: 285 | **Date**: 7/26/2002 | **Town**: DART | **Type**: QC | **Amount**: |

| **Description**: 13 ARCH ST REF.5213-121 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | **Grantees**:<br>AMERIQUEST MORTGAGE CO | | |
| **Book**: 6702 **Page**: 73 | **Date**: 12/12/2003 | **Town**: DART | **Type**: JUDG | **Amount**: |

| **Description**: 13 ARCH ST REF.5213-121 13 ARCH ST | | | | |
|---|---|---|---|---|
| **Grantors**: | | **Grantees**: | | |

Jadlowe partial title
07/04/2006
Page 15 of 27
3/15/2005

| FARIA, DONNA<br>FARIA, MANUEL A | | AMERIQUEST MORTGAGE CO | | | |
|---|---|---|---|---|---|
| **Book**: 6702 **Page**: 74 | **Date**: 12/12/2003 | **Town**: DART | **Type**: ENTRY | | **Amount**: |

**Description**: 13 ARCH ST REF.5213-121 13 ARCH ST

| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A<br>AMERIQUEST MORTGAGE CO | | **Grantees**:<br>SOKOL, CHRIS | | | |
|---|---|---|---|---|---|
| **Book**: 6702 **Page**: 75 | **Date**: 12/12/2003 | **Town**:<br>DART | **Type**:<br>FD | **Amount**:<br>213,000.00 | |

**Description**: 13 ARCH ST REF.1834-1057 13 ARCH ST

| **Grantors**:<br>DARTMOUTH TOWN COLLECTOR | | **Grantees**:<br>PACHECO, JESSIE<br>PACHECO, HILDA | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 28 | **Date**: 3/31/2004 | **Town**: DART | **Type**: REL | | **Amount**: |

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors**:<br>FARIA, DONNA<br>FARIA, MANUEL A | | | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 29 | **Date**: 3/31/2004 | **Town**: DART | **Type**: MLC | | **Amount**: |

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors**:<br>SWANSEA REALTY CORP<br>CDS REALTY CORP | | **Grantees**:<br>CORREIA, MARK<br>CORREIA, LISA | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 30 | **Date**: 3/31/2004 | **Town**:<br>DART | **Type**:<br>QC | **Amount**:<br>233,000.00 | |

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors**:<br>CORREIA, MARK<br>CORREIA, LISA | | **Grantees**:<br>NEW CENTURY MORTGAGE CORP | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 32 | **Date**: 3/31/2004 | **Town**: DART | **Type**: M | **Amount**: 198,050.00 | |

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors**:<br>CORREIA, MARK<br>CORREIA, LISA | | **Grantees**:<br>NEW CENTURY MORTGAGE CORP | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 52 | **Date**: 3/31/2004 | **Town**: DART | **Type**: M | **Amount**: 34,950.00 | |

**Description**: 13 ARCH ST 13 ARCH ST

| **Grantors**: | | | | | |
|---|---|---|---|---|---|

Jadlowe partial title
07/04/2006
Page 16 of 27

Bristol South Registry of Deeds - Search Results                                    Page 4 of 4

| CORREIA, MARK | | | | | |
|---|---|---|---|---|---|
| **Book**: 6863 **Page**: 57 | **Date**: 3/31/2004 | **Town**: DART | | **Type**: DOH | **Amount**: |

| **Description**: 30 ARCH ST 30 ARCH ST | | | | | |
|---|---|---|---|---|---|
| **Grantors**:<br>OLIVEIRA, MANUEL C | | **Grantees**:<br>OLIVEIRA, MANUEL C<br>JADLOWE, MARC ANTHONY | | | |
| **Book**: 4453 **Page**: 216 | **Date**: 6/30/1999 | **Town**: DART | | **Type**: QC | **Amount**: |

| **Description**: 30 ARCH ST LTS 460,461 P.B.14 P.35 30 ARCH ST | | | | | |
|---|---|---|---|---|---|
| **Grantors**:<br>OLIVEIRA, MANUEL C<br>JADLOWE, MARC ANTHONY | | **Grantees**:<br>FIRST CITIZENS FEDERAL CREDIT<br>UNION | | | |
| **Book**: 4533 **Page**: 155 | **Date**: 10/8/1999 | **Town**: DART | | **Type**: M | **Amount**: |

| **Description**: 30 ARCH ST 30 ARCH ST | | | | | |
|---|---|---|---|---|---|
| **Grantors**:<br>OLIVEIRA, MANUEL C | | | | | |
| **Book**: 4926 **Page**: 24 | **Date**: 3/16/2001 | **Town**: DART | | **Type**: MLC | **Amount**: |

| **Description**: 30 ARCH ST 30 ARCH ST | | | | | |
|---|---|---|---|---|---|
| **Grantors**:<br>OLIVEIRA, MANUEL C | | **Grantees**:<br>JADLOWE, THOMAS JAMES | | | |
| **Book**: 4926 **Page**: 25 | **Date**: 3/16/2001 | **Town**:<br>DART | **Type**:<br>QC | **Amount**:<br>160,000.00 | |

| Previous Page | Next Page | Page 1 of 3 | Back to Search Form |
|---|---|---|---|

© 2001 Bristol South Registry of Deeds.

Jadlowe partial title
07/04/2006
3/15/2005

http://www.newbedforddeeds.com/dsStreetSearchResults.asp

Hereby granting unto my said attorney full power and authority in my name and behalf to sign, seal, acknowledge, and deliver any and all deeds or other instruments in writing which she may deem necessary or proper in the premises, and otherwise to act in and concerning the premises as fully and effectually as I might do if personally present.

In witness whereof I hereunto set my hand and seal this eighteenth day of August in the year one thousand nine hundred and forty-two.

Signed and sealed in presence of          Robert C. Howland

Lillian H. Lapp

### STATE OF FLORIDA

Palm Beach, ss.  August 18, 1942.  Then personally appeared the above named Robert C. Howland and acknowledged the foregoing instrument to be his free act and deed before me, Mary M. Vaughan Notary Public My commission expires, Notary Public  State of Florida at large  My commission expires July 28, 1946.  Bonded by Mass. Bonding & Ins. Co.

Facsimile of
Notarial Seal
as in original.

```
MARY M. VAUGHAN  NOTARY PUBLIC
STATE OF FLORIDA AT LARGE
```

Attest:

Lawrence W. Eaton
Register

Received and recorded September 22, 1942 at 2 hrs. and 47 min. P. M.

Attest:

Lawrence W. Eaton
Register

HOME OWNERS' LOAN CORPORATION, a corporate    7249

instrumentality of the United States of America, organized and existing under Home Owners' Loan and by virtue of an Act of the Congress of the United States of America, known as the Home Owners' Loan Act of 1933, as amended, having its principal office in the City of Washington, District of Columbia, for consideration paid, grants to MANUEL C. OLIVEIRA and MARY C. OLIVEIRA, husband and wife, as tenants by the entirety of South Dartmouth, Mass. with QUITCLAIM COVENANTS A certain parcel of land with all buildings and structures now or hereafter standing or placed thereon situate in Dartmouth in the County of Bristol in the Commonwealth of Massachusetts, bounded and described as follows: Beginning at the northeasterly corner thereof at a point in the south line of Arch Street six hundred twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence southerly eighty (80) feet; thence westerly one hundred and forty and 01/100 (140.01) feet to the east line of Howland Avenue;  thence northerly sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence north-easterly therein twenty-nine and 23/100 (29.23) feet to said south line of Arch Street;  thence easterly therein one hundred and forty-five and 93/100 (145.93) feet to the point of beginning.

Home Owners' Loan
Corporation
to
Oliveira et ux.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated Dec. 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Meaning and intending hereby to convey the same premises described in a certain mortgage from Serafim Vieira and Maria Vieira, to Home Owners' Loan Corporation, dated June 26, 1934, and recorded with Bristol County Deeds, Book 749, Pages 506-507.

Said premises are hereby conveyed subject to any building law and zoning law requirements which may be in force and applicable; also subject to restrictions, easements and conditions of record, if any, so far as the same are now in force and applicable, to assessments (special or otherwise) and betterments, if any.

IN WITNESS WHEREOF, the said Home Owners' Loan Corporation has caused its    217

corporate seal to be hereto affixed and these presents to be signed, acknowledged and delivered in its name and behalf by Robert M. Kerr, Jr., Asst. Regional Manager at New York, N. Y., this 27th day of October, 1942 For authority see copy of resolution of the Board of Directors of the Home Owners' Loan Corporation, duly recorded with said Deeds, Book 427, Page 118

Facsimile of
Corporate Seal
as in original.
Attest:

*Lawrence W. Eaton*
*Register*

| HOME OWNERS' LOAN CORPORATION |
| WASHINGTON, D. C. |

HOME OWNERS' LOAN CORPORATION
By  Robert M. Kerr, Jr.
     Asst. Regional Manager

1-$2 1-50¢ 1-25¢ Int. Rev. Stamp
Cancelled M.C.O.  11/2/42

### STATE OF NEW YORK

NEW YORK, ss.  On this 27th day of October, 1942, before me appeared Robert .M. Kerr, Jr. to me personally known, who, being by me duly sworn, did say that he is the Asst. Regional Manager of the Home Owners' Loan Corporation, the corporation named in the foregoing instrument and that the seal affixed to said instrument is the corporate seal of said Corporation and was so affixed by authority of its Board of Directors,and said Robert M. Kerr, Jr. acknowledged said instrument to be the free act and deed of said Corporation. Catherine B. Ullrich NOTARY PUBLIC My commission expires: March 30, 1943. Catherine B. Ullrich, Notary Public Kings Co. Clk's No. 28, Reg. No.3010 N. Y. Co. Clk's No.29 Reg. No. 3-U-12 Bronx Co. Clk's No. 2, Reg. No.4-U-43 Queens Co. Clk's No. 1894, Reg. No. 7608 Nassau Co. Clk's No. 1-U-43 Cert. filed in My Commission expires March 30, 1943.

Facsimile of
Notarial Seal
as in original.
Attest:

*Lawrence W. Eaton*
*Register*

| CATHERINE B. ULLRICH |
| NOTARY PUBLIC |
| KINGS COUNTY, N. Y. |

Received and recorded November 3, 1942 at 1 hr. and 32 min. P. M.
                    Attest:

*Lawrence W. Eaton*
*Register*

7250

Oliveira et ux.
to
Home Owners' Loan
Corporation

*—34/50*
*Lec B 987 P.591*

*Dis. 12/10/51*
*Lec B. 1096 P.136*

KNOW ALL MEN BY THESE PRESENTS That we, Manuel C. Oliveira and Mary C. Oliveira, husband and wife, both of So. Dartmouth, Bristol County, hereinafter called Mortgagor, for consideration paid, grant unto HOME OWNERS' LOAN CORPORATION, a corporate instrumentality of the United States of America, organized and existing under and by virtue of an Act of the Congress of the United States of America, known as the Home Owners' Loan Act of 1933, as amended, having its principal office and place of business at Washington, D. C., hereinafter called Mortgagee, with MORTGAGE COVENANTS for the purpose of securing:

I.  Payment of the indebtedness evidenced by one promissory note (and any extension or renewal thereof), of even date herewith, which indebtedness represents and is the unpaid balance of the purchase price of the property hereinafter described, and each and all of the terms and provisions of said promissory note are hereby made a part hereof as if the same were set out in full at this place, for the principal sum of One thousand nine hundred eighty and 00/100 Dollars, with interest at the rate of four and one-half per cent (4½%) per annum from the 2nd day of November, 1942, until paid; principal and interest payable in installments of Fifteen and 15/100 Dollars on the 2nd day of each month, beginning on the 2nd day of December, 1942, and continuing until the 2nd day of November, 1957, on which last mentioned day all unpaid balances of said principal, together with interest thereon as aforesaid, shall be due and payable in any event.

218

Jadlowe partial title
07/04/2006
Page 19 of 27

BK  4218 PG 326
09/30/98 02:49 DOC. 26743
Bristol Co. S.D.

Know All Men By These Presents That I, Manuel C. Oliveira,

of Dartmouth,                                    Bristol    County, Massachusetts,

~~being unmarried,~~ for consideration paid $   love and affection

grant to Marc Anthony Jadlowe of 30 Arch Street, Dartmouth, Bristol
County, Massachusetts

                                ~~of~~

with ~~quitclaim covenants~~

the land in DARTMOUTH, Bristol County, Massachusetts, with the buildings
thereon, bounded and described as follows:
                    (Description and encumbrances, if any)

    Beginning at the northeasterly corner thereof at a point in the
south line of Arch Street 623.54 feet distant therein westerly from
its intersection with the west line of Bedford Street;

    thence southerly 80 feet;

    thence westerly 140.01 feet to the east line of Howland Avenue;

    thence northerly 64.46 feet to an angle in said Avenue;

    thence northeasterly therein 29.23 feet to said south line of Arch
Street;

    thence easterly therein  145.93 feet to the point of beginning.

    Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howlan
Farm, dated Dec. 28, 1915, filed in Bristol County S. D. Registry of
Deeds.

    Being the same premises conveyed to me and my late wife, Mary C.
Oliveira by deed of Home Owners' Loan Corporation dated October 27, 1942
and recorded in said Registry, Book 860, Page 217.

    My said late wife, Mary C. Oliveira died at New Bedford, Mass. on
April 6, 1992.

*(left margin, rotated:)* 30 Arch Street

BK 4218 PG 327

Witness, my....hand and seal this....28th..... day of.... September........1998.

_Fred M. Thomas_ ..............        _Manuel C. Oliveira_ .....
Witness                                Manuel C. Oliveira

................................        ................................

................................        ................................


The Commonwealth of Massachusetts

Bristol              ss.              New Bedford, Sept. 28, 1998

Then personally appeared the above named    Manuel C. Oliveira

and acknowledged the foregoing instrument to be  his  free act and deed

before me

_Fred M. Thomas_ ..................
Fred M. Thomas  -  Notary Public  ~~XXXXXXXXXXX~~
TNE

My Commission expires  Aug. 26, xx 2005.

BK  4453 PG 214
06/30/99 12:23 DOC. 19902
Bristol Co. S.D.

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, THAT I, MARC ANTHONY JADLOWE, of Dartmouth, Bristol County, Massachusetts,

for consideration paid, and in full consideration of love and affection,

grant to MANUEL C. OLIVEIRA, of 30 Arch Street, South Dartmouth, Massachusetts 02748, in fee simple,

with quitclaim covenants

the land in said Dartmouth, with the buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street 623.54 feet distant therein westerly from its intersection with the west line of Bedford Street;

thence southerly 80 feet;

thence westerly 140.01 feet to the east line of Howland Avenue;

thence northerly 64.46 feet to an angle in said Avenue;

thence northeasterly therein 29.23 feet to said south line of Arch Street;

thence easterly therein 145.93 feet to the pint of beginning.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated December 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Being the same premises conveyed to me by deed of said Manuel C. Oliveira, dated September 28, 1998, and recorded in said Registry in Book 4218, Page 326.

Address of granted premises: 30 Arch Street, South Dartmouth, Massachusetts 02748. This address is not part of this conveyance; its accuracy has not been verified.

NO TITLE SEARCH WAS PERFORMED IN THE PREPARATION OF THIS DEED.

Witness my hand and seal this $29^{+}$ day of June, 1999.

_____
WITNESS

_____
MARC ANTHONY JADLOWE

Jadlowe partial title
07/04/2006
Page 22 of 27

BK 4453 PG 215

## COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                New Bedford, June 29, 1999

Then personally appeared the above-named MARC ANTHONY

JADLOWE and acknowledged the foregoing instrument to be his free act and deed

before me

DAVID E. RUSSELL
Notary Public
My commission expires: 8/18/01

Page 2
RUSITZKY & RUSSELL • ATTORNEYS AT LAW • 324 UNION STREET, NEW BEDFORD MA 02740 • (508) 997-7854

BK  4453 PG 216
06/30/99 12:24  DOC. 19903
Bristol Co. S.D.

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, THAT I, MANUEL C. OLIVEIRA, of Dartmouth, Bristol County, Massachusetts,

for consideration paid, and in full consideration of love and affection,

grant to myself, MANUEL C. OLIVEIRA, of 30 Arch Street, South Dartmouth, Massachusetts 02748, an estate for and during the term of my natural life, together with full power to sell, lease, mortgage, convey or otherwise transfer the whole or any part thereof, in fee simple, at my discretion, with the remainder in fee to MARC ANTHONY JADLOWE, of 30 Arch Street, South Dartmouth, Massachusetts 02748. It is intended that for and during the term of my life estate, the signature or other assent of the remainder interest holder shall not be required to effectuate any sale, lease, mortgage, conveyance or other transfer of the whole or any part of the property herein transferred,

with quitclaim covenants

the land in said Dartmouth, with the buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street 623.54 feet distant therein westerly from its intersection with the west line of Bedford Street;

thence southerly 80 feet;

thence westerly 140.01 feet to the east line of Howland Avenue;

thence northerly 64.46 feet to an angle in said Avenue;

thence northeasterly therein 29.23 feet to said south line of Arch Street;

thence easterly therein 145.93 feet to the pint of beginning.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated December 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Being the same premises conveyed to me by deed of said Marc Anthony Jadlowe, dated June 29, 1999, and recorded in said Registry in Book 4453 , Page 214  .

BK  4453 PG 217

Address of granted premises: 30 Arch Street, South Dartmouth, Massachusetts 02748.
This address is not part of this conveyance; its accuracy has not been verified.

NO TITLE SEARCH WAS PERFORMED IN THE PREPARATION OF THIS
DEED.

Witness my hand and seal this 25th day of June, 1999.

_____          _____
WITNESS                            MANUEL C. OLIVEIRA

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                       New Bedford, June 25, 1999

Then personally appeared the above-named MANUEL C. OLIVEIRA

and acknowledged the foregoing instrument to be his free act and deed, before me

_____
DAVID E. RUSSELL
Notary Public
My commission expires: 8/16/02

Page 2
RUSITZKY & RUSSELL • ATTORNEYS AT LAW • 324 UNION STREET, NEW BEDFORD MA 02740 • (508) 997-7854

Hereby granting unto my said attorney full power and authority in my name and behalf to sign, seal, acknowledge, and deliver any and all deeds or other instruments in writing which she may deem necessary or proper in the premises, and otherwise to act in and concerning the premises as fully and effectually as I might do if personally present.

In witness whereof I hereunto set my hand and seal this eighteenth day of August in the year one thousand nine hundred and forty-two.

Signed and sealed in presence of          Robert C. Howland

Lillian H. Lapp

STATE OF FLORIDA

Palm Beach, ss.   August 18, 1942.   Then personally appeared the above named Robert C. Howland and acknowledged the foregoing instrument to be his free act and deed before me,   Mary M. Vaughan   Notary Public My commission expires, Notary Public   State of Florida at large   My commission expires July 28, 1946.  Bonded by Mass. Bonding & Ins. Co.

Facsimile of
Notarial Seal
as in original.

Attest:

| MARY M. VAUGHAN   NOTARY PUBLIC |
| STATE OF FLORIDA AT LARGE |

*Lawrence W. Eaton Register*

Received and recorded September 22, 1942 at 2 hrs. and 47 min. P. M.

Attest:          *Lawrence W. Eaton Register*

HOME OWNERS' LOAN CORPORATION, a corporate          7249

instrumentality of the United States of America, organized and existing under and by virtue of an Act of the Congress of the United States of America, known as the Home Owners' Loan Act of 1933, as amended, having its principal office in the City of Washington, District of Columbia, for consideration paid, grants to MANUEL C. OLIVEIRA and MARY C. OLIVEIRA, husband and wife, as tenants by the entirety of South Dartmouth, Mass. with QUITCLAIM COVENANTS A certain parcel of land with all buildings and structures now or hereafter standing or placed thereon situate in Dartmouth in the County of Bristol in the Commonwealth of Massachusetts, bounded and described as follows: Beginning at the northeasterly corner thereof at a point in the south line of Arch Street six hundred twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence southerly eighty (80) feet;  thence westerly one hundred and forty and 01/100 (140.01) feet to the east line of Howland Avenue;  thence northerly sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence north-easterly therein twenty-nine and 23/100 (29.23) feet to said south line of Arch Street;  thence easterly therein one hundred and forty-five and 93/100 (145.93) feet to the point of beginning.

Home Owners' Loan
Corporation
to
Oliveira et ux.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated Dec. 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Meaning and intending hereby to convey the same premises described in a certain mortgage from Serafim Vieira and Maria Vieira, to Home Owners' Loan Corporation, dated June 26, 1934, and recorded with Bristol County Deeds, Book 749, Pages 506-507.

Said premises are hereby conveyed subject to any building law and zoning law requirements which may be in force and applicable;  also subject to restrictions, easements and conditions of record, if any, so far as the same are now in force and applicable, to assessments (special or otherwise) and betterments, if any.

IN WITNESS WHEREOF, the said Home Owners' Loan Corporation has caused its

corporate seal to be hereto affixed and these presents to be signed,
acknowledged and delivered in its name and behalf by Robert M. Kerr, Jr.,
Asst. Regional Manager at New York, N. Y., this 27th day of October, 1942
For authority see copy of resolution of the Board of Directors of the Home
Owners' Loan Corporation, duly recorded with said Deeds, Book 427, Page 118

Facsimile of
Corporate Seal
as in original.
Attest:

*Lawrence W. Eaton*
*Register*

| HOME OWNERS' LOAN CORPORATION |
| WASHINGTON, D. C. |

HOME OWNERS' LOAN CORPORATION
By  Robert M. Kerr, Jr.
Asst. Regional Manager

1–$2 1–50¢ 1–25¢ Int. Rev. Stamp
Cancelled M.C.O.  11/2/42

STATE OF NEW YORK

NEW YORK, ss.  On this 27th day of October, 1942, before me appeared Robert
M. Kerr, Jr. to me personally known, who, being by me duly sworn, did say
that he is the Asst. Regional Manager of the Home Owners' Loan Corporation,
the corporation named in the foregoing instrument and that the seal affixed
to said instrument is the corporate seal of said Corporation and was so
affixed by authority of its Board of Directors,and said Robert M. Kerr, Jr.
acknowledged said instrument to be the free act and deed of said Corporation.
Catherine B. Ullrich NOTARY PUBLIC  My commission expires: March 30, 1943.
Catherine B. Ullrich, Notary Public  Kings Co. Clk's No. 28, Reg. No.3010
N. Y. Co. Clk's No.29 Reg. No. 3-U-12  Bronx Co. Clk's No. 2, Reg. No.4-U-43
Queens Co. Clk's No. 1894, Reg. No. 7603  Nassau Co. Clk's No. 1-U-43  Cert.
filed in  My Commission expires March 30, 1943.

Facsimile of
Notarial Seal
as in original.
Attest:

*Lawrence W. Eaton*
*Register*

| CATHERINE B. ULLRICH |
| NOTARY PUBLIC |
| KINGS COUNTY, N. Y. |

Received and recorded November 3, 1942 at 1 hr. and 32 min. P. M.
Attest:

*Lawrence W. Eaton*
*Register*

7250
Oliveira et ux.
to
Home Owners' Loan
Corporation

*34430*
*Sec.B981/P271*

*Dis. 12/10/51*
*Lu. B.10366 P.156*

218

KNOW ALL MEN BY THESE PRESENTS That we,
Manuel C. Oliveira and Mary C. Oliveira, husband and wife, both of So.
Dartmouth, Bristol County, hereinafter called Mortgagor, for consideration
paid, grant unto HOME OWNERS' LOAN CORPORATION, a corporate instrumentality
of the United States of America, organized and existing under and by virtue
of an Act of the Congress of the United States of America, known as the
Home Owners' Loan Act of 1933, as amended, having its principal office and
place of business at Washington, D. C., hereinafter called Mortgagee, with
MORTGAGE  COVENANTS for the purpose of securing:

I.  Payment of the indebtedness evidenced by one promissory note (and any
extension or renewal thereof), of even date herewith, which indebtedness
represents and is the unpaid balance of the purchase price of the property
hereinafter described, and each and all of the terms and provisions of said
promissory note are hereby made a part hereof as if the same were set out in
full at this place, for the principal sum of One thousand nine hundred eighty
and 00/100 Dollars, with interest at the rate of four and one-half per cent
(4½%) per annum from the 2nd day of November, 1942, until paid; principal
and interest payable in installments of Fifteen and 15/100 Dollars on the
2nd day of each month, beginning on the 2nd day of December, 1942, and
continuing until the 2nd day of November, 1957, on which last mentioned day
all unpaid balances of said principal, together with interest thereon as
aforesaid, shall be due and payable in any event.

Return To:
MERITAGE MORTGAGE CORPORATION
6000 SOUTHWEST MEADOWS ROAD, SUITE 500
LAKE OSWEGO, OR  97035

BK  4926 PG  27
03/16/01 04:04 DOC. 6508
Bristol Co. S.D.

Prepared By:
MERITAGE MORTGAGE CORPORATION
8031 PHILLIPS HIGHWAY, SUITE 6
JACKSONVILLE, FL  32256

—————————————————[Space Above This Line For Recording Data]—————————————————

# MORTGAGE

Loan Number: 1000000084

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated              MARCH 16, 2001              ,
together with all Riders to this document.
(B) "Borrower" is
THOMAS JAMES JADLOWE, A MARRIED MAN

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is
                          MERITAGE MORTGAGE CORPORATION,
                          AN OREGON CORPORATION
Lender is a
organized and existing under the laws of                               OREGON

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022  1/01

VMP -6(MA) (0005)
Page 1 of 15          Initials: _TJJ_
      VMP MORTGAGE FORMS - (800)521-7291
DOS-MA3



28

BK  4926 PG  28

Lender's address is 6000 SOUTHWEST MEADOWS ROAD, SUITE 500
LAKE OSWEGO, OR  97035
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated       MARCH 16, 2001
The Note states that Borrower owes Lender
One Hundred Twenty-Eight Thousand  & 00/100                               Dollars
(U.S. $128,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       April 01, 2031
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

                                            Prepayment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6(MA) (0005)                          Page 2 of 15          Initials: _____          Form 3022  1/01
D0D-MA3

29

BK  4926 PG  29

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the  COUNTY                                                          [Type of Recording Jurisdiction]
of                            BRISTOL                    [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: MAP 128 LOT 157                          which currently has the address of
30 ARCH STREET                                                                        [Street]
SOUTH DARTMOUTH                               [City] , Massachusetts 02748            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(MA) (0005)                          Page 3 of 15                    Initials:                   Form 3022   1/01
DDS-MA3

*30*

BK    4926 PG    30

currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

31

BK  4926 PG  31

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

32

BK  4926 PG  32

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

34

BK 4926 PG 34

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6(MA) (0006)
DDS-MA3

Page 8 of 15

Initials: 

Form 3022   1/01

35

BK  4926 PG  38

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6(MA) (0005)
DDS MA3

Page 12 of 15

Initials: _____

Form 3022  1/01

*39*

BK 4926 PG 39

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

*40*

BK  4926 PG  40

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Thomas James Jadlowe_ (Seal)
                                            THOMAS JAMES JADLOWE                -Borrower
                                            30 ARCH STREET
                                            SOUTH DARTMOUTH, MA  02748

_____          _____ (Seal)
                                                                           -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                                 -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                                 -Borrower

_____ (Seal)            _____ (Seal)
                 -Borrower                                                 -Borrower

 -6(MA) (0005)          Page 14 of 15          Form 3022   1/01
DDS-MA3

41

BK  4926 PG  41

COMMONWEALTH OF MASSACHUSETTS,            Bristol            County ss:

   On this    16th    day of    March, 2001            , before me personally appeared

      Thomas James Jadlowe

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:   10/2/03

                                              _____
                                              Notary Public

42

BK  4926 PG  42

# ADJUSTABLE RATE RIDER

### (LIBOR 6 Month Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **16TH** day of **MARCH, 2001** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to:

**MERITAGE MORTGAGE CORPORATION,**
**AN OREGON CORPORATION**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**30 ARCH STREET**
**SOUTH DARTMOUTH, MA  02748**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of **9.990** %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the first day of **APRIL, 2004**, and on that day every **6TH** month thereafter. Each date on which my interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London Market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.
    **(C) Calculation of Changes**
    Before each Change Date, the Note Holder will calculate my new interest rate by adding **SIX AND THREE EIGHTHS** percentage points (**6.375** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

DDS-WMK                                    Page 1 of 3

*TPP*

*43*

BK  4926 PG  43

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **12.990%** or less than **9.990%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND ONE HALF** percentage point(s) ( **1.500%** ) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **16.990%**, or less than **9.990%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**DDS-WMK**                                    Page 2 of 3

BK　4926 PG　44

　　　　BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Thomas James Gadloue_　　　3-16-01　　　(SEAL)
THOMAS JAMES GADLOW　　　　　DATE

45

BK  4926 PG  45

## EXHIBIT "A"

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street;  thence

| | |
|---|---|
| SOUTHERLY | Eighty (80) feet;  thence |
| WESTERLY | One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue;  thence |
| NORTHERLY | Sixty-four and 46/100 (64.46) feet to an angle in said Avenue;  thence |
| NORTHEASTERLY | therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street;  and thence |
| EASTERLY | thereon One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning. |

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed of even date to be recorded herewith.

*46*

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Prepared By:Ameriquest Mortgage Company

**BK 6203 PG 80**
05/12/03 04:18  DOC. 22755
Bristol Co. S.D.

Tammy Pacheco
92 Faunce Corner Rd. #
120,North Dartmouth. MA
02747

————————————[Space Above This Line For Recording Data]————————————

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is datedMay 1, 2003                          ,
together with all Riders to this document.
**(B) "Borrower"** isThomas   James Jadlowe

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

0046967790 - 5790

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT            Form 3022  1/01

VMP -6(MA) (0005)
Page 1 of 15            Initials: _____

05/01/2003 8:10:59 AM

VMP MORTGAGE FORMS - (800)521-7291

47

**BK 6203 PG 81**

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated May 1, 2003
The Note states that Borrower owes Lender one hundred seventy thousand and 00/100

Dollars
(U.S. $170,000.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than June 1, 2033
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | EXhibit A |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(K) "Escrow Items"** means those items that are described in Section 3.
**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

0046967790-5790
Initials: _____

-6(MA) (0005)                          Page 2 of 15          05/01/2003 8:10:59   Form 3022  1/01

48

BK 6203 PG 82

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County                                                            [Type of Recording Jurisdiction]
of BRISTOL                                    [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 128:157                          which currently has the address of
30 Arch Street                                                              [Street]
SOUTH DARTMOUTH                    [City] , Massachusetts 02748        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0046967790 - 5790
Initials:

-6(MA) (0005)            Page 3 of 15  05/01/2003 8:10:59 AM  Form 3022  1/01

49

BK 6203 PG 83

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

0046967790 - 5790
Initials: _TJJ_

50

BK 6203 PG 84

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

5/

BK 6203 PG 85

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

0046967790 - 5790
Initials:

52

BK 6203 PG 86

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



BK 6203 PG 87

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

0046967790 -5790
Initials: [TS]

-6(MA) (0005)                    Page 8 of 15    05/01/2003 8:10:59    Form 3022  1/01

54

BK 6203 PG 88

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

0046967790 - 5790
Initials: T.T.

-6(MA) (0005)          Page 9 of 15    05/01/2003 8:10:59    Form 3022  1/01

54

BK 6203 PG 89

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0046967790 - 5790
Initials: 

-6(MA) (0005)    Page 10 of 15    05/01/2003 8:10:59    Form 3022   1/01



BK 6203 PG 90

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

0046967790 - 5790
Initials: _____

 -6(MA) (0005)    Page 11 of 15    05/01/2003 8:10:59    Form 3022    1/01

5 6

BK 6203 PG 91

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0046967790 - 5790
Initials: _JJ_

-6(MA) (0005)                    Page 12 of 15    05/01/2003 8:10:59    Form 3022  1/01

57

BK 6203 PG 92

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

58

BK 6203 PG 93

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)

Thomas    James  Jadlowe          -Borrower

_____

_____ (Seal)
                                  -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                  -Borrower

0046967790 - 5790

 -6(MA) (0005)        Page 14 of 15  05/01/2003  8:10:59 AM Form 3022  1/01



BK 6203 PG 94

**COMMONWEALTH OF MASSACHUSETTS,** BRISTOL County **ss:**

On this _____1ST_____ day of _____MAY, 2003_____ before me personally
                        Day                        Month/Year

appeared

_____THOMAS  JAMES  JADLOWE_____

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:

CARLA F. BAUMGARTNER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 12, 2008


Notary Public

400-15MA (4/02)               Page 15 of 15          0046967790 - 5790

                                  TJJ                 05/01/2003 8:10:59 AM

60

**BK 6203 PG 95**

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 1st day of May , 2003    and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Arch Street, SOUTH DARTMOUTH, MA  02748
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   6.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
#### (A) Change Dates
The interest rate I will pay may change on the first day of June, 2005  , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

#### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials _T J J_

Loan Number:  0046967790 - 5790

05/01/2003 8:10:59 AM

BK 6203 PG 96

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **five** percentage points ( **5.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **8.990% or less than 6.990%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One( **1.000 %)** from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 12.990)% or less than 6.990)%.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials ___TJJ___

Loan Number:  0046967790 - 5790

05/01/2003 8:10:59 AM

63

BK 6203 PG 97

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Thomas James Jadlowe_ (Seal)
Borrower Thomas James Jadlowe

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

Loan Number:  0046967790 - 5790

610-3 (Rev 1/01)                    Page 3 of 3

05/01/2003 8:10:59 AM

64

BK 6203 PG 98

## EXHIBIT A
## LEGAL DESCRIPTION

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, situated and described as follows:

Beginning at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

SOUTHERLY Eighty (80) feet; thence

WESTERLY One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue; thence

NORTHERLY Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street; and thence

EASTERLY therein One Hundred Forty-Five and 93/100 (145.93) feet to the point of beginning. BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 part of Howland Farms, dated December 28, 1915 and filed in Bristol County South District Registry of Deeds in Book 4890, Page 10.

For title reference, see deed recorded with said Registry Deeds in Book 4926, Page 25.

65

Recording Requested By:
ALTA REAL ESTATE SERVICES, INC.

When Recorded Return To:

RECONVEYANCE DEPARTMENT
ALTA REAL ESTATE SERVICES, INC
P.O. BOX 551170
ATTN: RECONVEYANCE DEPT.
JACKSONVILLE, FL 32255

**BK 6426 PG 76**
08/07/03 08:34 DOC. 38892
Bristol Co. S.D.

## DISCHARGE OF MORTGAGE

LOAN SERVICING CENTER #:4000572380 "JADLOWE" Lender ID:S10/1000594365  Bristol Southern District, Massachusetts
KNOW ALL MEN BY THESE PRESENTS that FAIRBANKS CAPITAL CORP. whose address is 10401 DEERWOOD
PARK BLVD., JACKSONVILLE, FL 32256 holder of a certain Mortgage, whose parties, dates and recording
information are below, does hereby acknowledge that it has received full payment and satisfaction of the same, and
in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: THOMAS JAMES JADLOWE, A MARRIED MAN
Original Mortgagee: MERITAGE MORTGAGE CORPORATION
Date Executed: 03/16/2001 Recorded: 03/16/2001 in Book/Reel/Liber: 4926 Page/Folio: 27 as Instrument No.: N/A

In the County of Bristol Southern District, State of Massachusetts

Property Address: 30 ARCH STREET, SOUTH DARTMOUTH, MA 02748

IN WITNESSOF, the said FAIRBANKS CAPITAL CORP. by its authorized officer, has hereunto set its corporate
seal.

FAIRBANKS CAPITAL CORP.
On June 5th, 2003

By:
R. COTTLE, Vice-President

STATE OF Florida
COUNTY OF Duval

On June 5th, 2003, before me, SARA J. HARDIN, a Notary Public in and for Duval County, in the State of Florida,
personally appeared R. COTTLE, Vice-President, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

SARA J. HARDIN
Notary Expires: 12/15/2003 #CC895660

SARA J. HARDIN
NOTARY PUBLIC - STATE OF FLORIDA
COMMISSION # CC895660
EXPIRES 12/15/2003
BONDED THRU ASA 1-888-NOTARY1

(This area for notarial seal)