UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Docket number 2005 CV 10516 REK 05

THOMAS JAMES JADLOWE

V.

THE TOWN OF DARTMOUTH
LEONARD GONSALVES
MICHAEL J. GAGNE'
DONALD A. PERRY
SCOTT E. SYLVIA
JOEL S. REED
JEANNE E. LENTINI

## PLAINTIFF'S COUNSEL'S AFFIDAVIT AS TO THE RECORD TITLE AND THE STATE COURT'S ACTION ON THE APPEAL OF AN ABUTTER TO THE VARIANCE GRANTED BY THE TOWN

1) Your affiant is the Plaintiff's attorney of record and he states under the pains and penalties of perjury the following facts.

2) He is an attorney duly admitted to the practice of law in Massachusetts and has practiced law in Massachusetts since 1962.

3) During the years from 1962 until about 1980 he commonly did so called real estate title searches and certified titles, and he is knowledgeable with the registry of deeds. Exhibit

4) He conducted a partial title search and attached hereto are the documents of record that he believes are material to this matter:

   a) The deed into Mr. Marc Jadlowe from Mr. Oliveira Exhibit "A"

   b) The deed into Mr. Oliveira from MR. Jadlowe Exhibit "B"

1

c) The deed into Mr. Oliveira to himself as a life tenant with the power to convey and the remainder ot Marc Jadlowe Exhibit "C"

d) The Deed from Oliveira to the Plaintiff Exhibit "D"

e) The Mortgage from the Plaintiff to Meritage Mortgage Corporation. Exhibit "E"

f) The Mortgage discharge from Meritage  Exhibit "F"

g) The Mortgage from Jadlowe to Ameriquest Mortgage Copmany. Exhibit "H"

h) The title document by Ameriquest's attorney showing that Jadlowe had a fee simple interest in the property. Exhibit "I"

i) The Opposition to the motion for the Plaintiff to further mortgage the real estate. Exhibit "J"

j) The State Court's order remanding the Zoning Variance appeal back to the ZBA. Exhibit "K".

5) As to exhibits A through H I personally obtained the document and they are true copies of the records at the Bristol Registry of Deed (Southern District) and as to Exhibit I, it was sent directly to me from Counsel for Ameriquest and offered to show that this was an arms length transaction and that the Title attorney considered the title to be marketable and that Plaintiff held a fee simple interest.   As to Exhibit "K" I am the attorney of record and that is the last order of the State Trial Court.

s/Donald J. Fleming  April 17, 2007
Donald J. Fleming            date

2

| | | | | Jadlowe v Town of Dartmouth and others 05- | | |
|---|---|---|---|---|---|---|
| | | | | EXHIBIT LIST OF ATTACHMENTS TO ATTORNEY AFFIDAVIT | | |
| pg | exhibit | description | from | to | recording date | consideration |
| 1 | A | Deed | Oliveira | Marc Jadlowe | 9/30/1998 | $ 1.00 |
| 3 | B | Deed | Marc Jadlowe | Oliveira | 6/30/1999 | |
| 5 | C | Deed | Oliveira | Oliveira life estate and Marc Jadlowe remainderman | 6/30/1999 | $ 1.00 |
| 7 | D-1 | Deed | OLiveira | Plaintiff | 9/12/2000 | $ 1.00 |
| 8 | D-2 | Deed | Plaintiff | Oliveira | 2/2/2001 | $ 1.00 |
| 9 | D-3 | Deed | Oliveira | Plaintiff | 3/16/2001 | $ 160,000.00 |
| 11 | E | Mortgage | Plaintiff | Meritage Mortgage Corporation | 3/16/2001 | $ 128,000.00 |
| 30 | F | Discharge of mortgage | Meritage | Plaintiff | 8/7/2003 | payoff by Ameriquset |
| 31 | H | Mortgage | Plaintiff | Ameriquest Mortgage Company | 5/12/2003 | $ 170,000.00 |
| 50 | I | correspondence | title attorneys | Plaintiff's attorney | see document | N/A |
| 55 | J | pleading | A USA | Court | 4/18/2006 | N/A |
| 61 | K | clerk's notice | State Court | Plaintiff | 4/12/2007 | N/A |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Docket number 2005 CV 10516 REF 05

THOMAS JAMES JADLOWE

V.

THE TOWN OF DARTMOUTH
LEONARD GONSALVES
MICHAEL J. GAGNE'
DONALD A. PERRY
SCOTT E. SYLVIA
JOEL S. REED
JEANNE E. LENTINI

## PLAINTIFF'S COUNSEL'S AFFIDAVIT AS TO THE RECORD TITLE AND THE STATE COURT'S ACTION ON THE APPEAL OF AN ABUTTER TO THE VARIANCE GRANTED BY THE TOWN

1) Your affiant is the Plaintiff's attorney of record and he states under the pains and penalties of perjury the following facts.

2) He is an attorney duly admitted to the practice of law in Massachusetts and has practiced law in Massachusetts since 1962.

3) During the years from 1962 until about 1980 he commonly did so called real estate title searches and certified titles, and he is knowledgeable with the registry of deeds. Exhibit

4) He conducted a partial title search and attached hereto are the documents of record that he believes are material to this matter:

   a) The deed into Mr. Marc Jadlowe from Mr. Oliveira Exhibit "A"

   b) The deed into Mr. Oliveira from MR. Jadlowe Exhibit "B"

1

c) The deed into Mr. Oliveira to himself as a life tenant with the power to convey and the remainder ot Marc Jadlowe Exhibit "C"

d) The Deed from Oliveira to the Plaintiff Exhibit "D"

e) The Mortgage from the Plaintiff to Meritage Mortgage Corporation. Exhibit "E"

f) The Mortgage discharge from Meritage  Exhibit "F"

g) The Mortgage from Jadlowe to Ameriquest Mortgage Copmany. Exhibit "H"

h) The title document by Ameriquest's attorney showing that Jadlowe had a fee simple interest in the property. Exhibit "I"

i) The Opposition to the motion for the Plaintiff to further mortgage the real estate. Exhibit "J"

j) The State Court's order remanding the Zoning Variance appeal back to the ZBA. Exhibit "K".

5) As to exhibits A through H I personally obtained the document and they are true copies of the records at the Bristol Registry of Deed (Southern District) and as to Exhibit I, it was sent directly to me from Counsel for Ameriquest and offered to show that this was an arms length transaction and that the Title attorney considered the title to be marketable and that Plaintiff held a fee simple interest.   As to Exhibit "K" I am the attorney of record and that is the last order of the State Trial Court.

s/Donald J. Fleming  April 17, 2007
Donald J. Fleming          date

2

| | | | | | Jadlowe v Town of Dartmouth and others 05- | | |
| | | | | | EXHIBIT LIST OF ATTACHMENTS TO ATTORNEY AFFIDAVIT | | |
| pg | exhibit | description | from | to | | recording date | consideration |
|---|---|---|---|---|---|---|---|
| 1 | A | Deed | Oliveira | Marc Jadlowe | | 9/30/1998 | $ 1.00 |
| 3 | B | Deed | Marc Jadlowe | Oliveira | | 6/30/1999 | |
| 5 | C | Deed | Oliveira | Oliveira life estate and Marc Jadlowe remainderman | | 6/30/1999 | $ 1.00 |
| 7 | D-1 | Deed | OLiveira | Plaintiff | | 9/12/2000 | $ 1.00 |
| 8 | D-2 | Deed | Plaintiff | Oliveira | | 2/2/2001 | $ 1.00 |
| 9 | D-3 | Deed | Oliveira | Plaintiff | | 3/16/2001 | $ 160,000.00 |
| 11 | E | Mortgage | Plaintiff | Meritage Mortgage Corporation | | 3/16/2001 | $ 128,000.00 |
| 30 | F | Discharge of mortgage | Meritage | Plaintiff | | 8/7/2003 | payoff by Ameriquset |
| 31 | H | Mortgage | Plaintiff | Ameriquest Mortgage Company | | 5/12/2003 | $ 170,000.00 |
| 50 | I | correspondence | title attorneys | Plaintiff's attorney | | see document | N/A |
| 55 | J | pleading | A USA | Court | | 4/18/2006 | N/A |
| 61 | K | clerk's notice | State Court | Plaintiff | | 4/12/2007 | N/A |

BK   4218 PG 326
09/30/98 02:49 DOC. 26743
Bristol Co. S.D.

Know All Men By These Presents That I, Manuel C. Oliveira,

of  Dartmouth,                          Bristol   County, Massachusetts,

~~heretofore married,~~ for consideration paid $   love and affection

grant to  Marc Anthony Jadlowe of 30 Arch Street, Dartmouth, Bristol
County, Massachusetts

∞

with  quitclaim covenants

the land in DARTMOUTH, Bristol County, Massachusetts, with the buildings
thereon, bounded and described as follows:
(Description and encumbrances, if any)

Beginning at the northeasterly corner thereof at a point in the
south line of Arch Street 623.54 feet distant therein westerly from
its intersection with the west line of Bedford Street;

thence southerly 80 feet;

thence westerly 140.01 feet to the east line of Howland Avenue;

thence northerly 64.46 feet to an angle in said Avenue;

thence northeasterly therein 29.23 feet to said south line of Arch
Street;

thence easterly therein  145.93 feet to the point of beginning.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland
Farm, dated Dec. 28, 1915, filed in Bristol County S. D. Registry of
Deeds.

Being the same premises conveyed to me and my late wife, Mary C.
Oliveira by deed of Home Owners' Loan Corporation dated October 27, 1942
and recorded in said Registry, Book 860, Page 217.

My said late wife, Mary C. Oliveira died at New Bedford, Mass. on
April 6, 1992.

*(left margin, vertical: 30 Arch Street)*

BX 14181/5 "B"

BK 4218 PG 327

**Witness**, my....hand and seal this....28th..... day of.... September.........1998.

*Fred M. Thomas* ............    *Manuel C. Oliveira* ....
Witness                              Manuel C. Oliveira

............................................    ............................................

............................................    ............................................

The Commonwealth of Massachusetts

Bristol          ss.                    New Bedford, Sept. 28, 1998

Then personally appeared the above named    Manuel C. Oliveira

and acknowledged the foregoing instrument to be his free act and deed

before me

*Fred M. Thomas* ............
Fred M. Thomas - Notary Public - ~~Justice of the Peace~~

TNE

My Commission expires Aug. 26, XX 2005.

BK    4453 PG 214
06/30-99 12:23 DOC. 19902
Bristol Co. S.D.

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, THAT I, MARC ANTHONY JADLOWE, of Dartmouth, Bristol County, Massachusetts,

for consideration paid, and in full consideration of love and affection,

grant to MANUEL C. OLIVEIRA, of 30 Arch Street, South Dartmouth, Massachusetts 02748, in fee simple,

with quitclaim covenants

the land in said Dartmouth, with the buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street 623.54 feet distant therein westerly from its intersection with the west line of Bedford Street;

thence southerly 80 feet;

thence westerly 140.01 feet to the east line of Howland Avenue;

thence northerly 64.46 feet to an angle in said Avenue;

thence northeasterly therein 29.23 feet to said south line of Arch Street;

thence easterly therein 145.93 feet to the pint of beginning.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated December 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Being the same premises conveyed to me by deed of said Manuel C. Oliveira, dated September 28, 1998, and recorded in said Registry in Book 4218, Page 326.

Address of granted premises: 30 Arch Street, South Dartmouth, Massachusetts 02748. This address is not part of this conveyance; its accuracy has not been verified.

NO TITLE SEARCH WAS PERFORMED IN THE PREPARATION OF THIS DEED.

Witness my hand and seal this $29^{+}$ day of June, 1999.

WITNESS

MARC ANTHONY JADLOWE

3

Jadlowe partial title
07/04/2006
Page 22 of 27

EXHIBIT "B"

BK 4453 PG 215

## COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                        New Bedford, June 2 9 , 1999

Then personally appeared the above-named MARC ANTHONY

JADLOWE and acknowledged the foregoing instrument to be his free act and deed

before me

DAVID E. RUSSELL
Notary Public
My commission expires: 8/16/01

Page 2
RUSITZKY & RUSSELL • ATTORNEYS AT LAW • 394 UNION STREET, NEW BEDFORD MA 02740 • (508) 987-7854

4

EXHIBIT "A"

BK  4453 PG 216
06/30/99 12:24  DOC. 19903
Bristol Co. S.D.

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, THAT I, MANUEL C. OLIVEIRA, of Dartmouth, Bristol County, Massachusetts,

for consideration paid, and in full consideration of love and affection,

grant to myself, MANUEL C. OLIVEIRA, of 30 Arch Street, South Dartmouth, Massachusetts 02748, an estate for and during the term of my natural life, together with full power to sell, lease, mortgage, convey or otherwise transfer the whole or any part thereof, in fee simple, at my discretion, with the remainder in fee to MARC ANTHONY JADLOWE, of 30 Arch Street, South Dartmouth, Massachusetts 02748. It is intended that for and during the term of my life estate, the signature or other assent of the remainder interest holder shall not be required to effectuate any sale, lease, mortgage, conveyance or other transfer of the whole or any part of the property herein transferred,

with quitclaim covenants

the land in said Dartmouth, with the buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street 623.54 feet distant therein westerly from its intersection with the west line of Bedford Street;

thence southerly 80 feet;

thence westerly 140.01 feet to the east line of Howland Avenue;

thence northerly 64.46 feet to an angle in said Avenue;

thence northeasterly therein 29.23 feet to said south line of Arch Street;

thence easterly therein 145.93 feet to the pint of beginning.

Being lots No. 458, 459, 460, 461 on plan of No. #2 of part of Howland Farm, dated December 28, 1915, filed in Bristol County S. D. Registry of Deeds.

Being the same premises conveyed to me by deed of said Marc Anthony Jadlowe, dated June 29, 1999, and recorded in said Registry in Book 4453, Page 214 .

5

EXHIBIT "C"

BK   4453 PG 217

Address of granted premises: 30 Arch Street, South Dartmouth, Massachusetts 02748.
This address is not part of this conveyance; its accuracy has not been verified.

NO TITLE SEARCH WAS PERFORMED IN THE PREPARATION OF THIS
DEED.

Witness my hand and seal this 25th day of June, 1999.

WITNESS

Manuel C. Oliveira
MANUEL C. OLIVEIRA

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                    New Bedford, June 25 , 1999

Then personally appeared the above-named MANUEL C. OLIVEIRA

and acknowledged the foregoing instrument to be his free act and deed, before me

DAVID E. RUSSELL
Notary Public
My commission expires: 8/16/02

Page 2
RUSITZKY & RUSSELL • ATTORNEYS AT LAW • 324 UNION STREET, NEW BEDFORD MA 02740 • (508) 997-7854

Exhibit "C"

BK   4773  PG  151
09/12/00 02:12  DOC. 21910
Bristol Co. S.D.

## MASSACHUSETTS QUITCLAIM DEED

I, MANUEL C. OLIVEIRA,

of Dartmouth,                                              Bristol County, Massachusetts

being unmarried, for consideration paid, and in full consideration of $1.00

grant to THOMAS JAMES JADLOWE,

of 198 Main Street, Fairhaven, Massachusetts 02719

with *quitclaim covenants*

the land, with any buildings thereon, in Dartmouth, Bristol County, Commonwealth of
Massachusetts, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, six
hundred twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with
the west line of Bedford Street; thence

SOUTHERLY       eighty (80) feet; thence

WESTERLY        one hundred forty and 01/100 (140.01) feet to the east line of Howland
                Avenue; thence

NORTHERLY       sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY   therein twenty-nine and 23/100 (29.23) feet to said south line of Arch
                Street; and thence

EASTERLY        therein one hundred forty-five and 93/100 (145.93) feet to the point of
                beginning.

BEING Lots No. 458, 459, 460 and 461 on Plan of No. 2 of Part of Howland Farm, dated
December 28, 1915, filed in the Bristol County (S.D. Registry of Deeds.

FOR TITLE, see deed recorded on June 30, 1999 in Bristol County (S.D.) Registry of Deeds in
Book 4453, Page 216.

SUBJECT to the fiscal year 2001 real estate taxes which the grantee assumes and agrees to pay.

TITLE NOT EXAMINED BY THE PREPARER OF THIS DEED.

*WITNESS* my hand and seal this _15th_ day of September, 2000.

_Dorothy S. Carvalho_                    _Manuel C. Oliveira_
Witness                                  Manuel C. Oliveira

### THE COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.                                          September _12_, 2000

         Then personally appeared the above-named Manuel C. Oliveira and acknowledged the
foregoing instrument to be his free act and deed, before me,

                                         _Dorothy S. Carvalho_
                                              Notary Public
                         My commission expires: _03/03/01_

EXHIBIT

Jadlowe partial title
07/04/2006
Page 5 of 27

Rx 141415 "D" - 1

BK  4890 PG  10
02/02/01 02:10  DOC. 2908
Bristol Co. S.D.

MASSACHUSETTS QUITCLAIM DEED

I, THOMAS JAMES JADLOWE

of Fairhaven                                              Bristol County, Massachusetts,

*being unmarried,* for consideration paid, and in full consideration of One ($1.00) Dollar

grant to Manuel C. Oliveira

at 30 Arch Street, Dartmouth, Massachusetts                    with **Quitclaim Covenants**

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings
thereon, bounded and described as follows:

(Description and encumbrances, if any)

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six
Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection
with the west line of Bedford Street; thence

SOUTHERLY        Eighty (80) feet; thence

WESTERLY         One Hundred Forty and 01/100 (140.01) feet to the east line of Howland
                 Avenue; thence

NORTHERLY        Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY    therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch
                 Street; and thence

EASTERLY         therein One Hundred Forty-five and 93/100 (145.93) feet to the point of
                 beginning.

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated
December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed dated September 12, 2000 and recorded in the Bristol County (S.D.)
Registry of Deeds in Book 4773, Page 151.

Subject to the real estate taxes for fiscal year 2001 which the grantee hereby assumes and agrees
to pay.

TITLE NOT EXAMINED BY THE PREPARER OF THIS DEED.

*WITNESS* our hands and seals this 1st day of February, 2001.

_____        Thomas James Jadlowe

**COMMONWEALTH OF MASSACHUSETTS**

BRISTOL, SS.                                              February 1, 2001

Then personally appeared the above-named Thomas James Jadlowe and acknowledged
the foregoing instrument to be his free act and deed, before me

Joyce A. Harmon
Notary Public

My Commission Expires: May 3, 2007

Jadlowe partial title
Jadlowe title info request
07/04/2006
Page 6 of 13
Page 6 of 13

9        10        EXHIBIT 7

BK   4926  PG   25
03/16/01 04:03  DOC. 6507
Bristol Co. S.D.



## MASSACHUSETTS QUITCLAIM DEED

I, MANUEL C. OLIVEIRA

of Dartmouth                                   Bristol County, Massachusetts,

*being unmarried,* for consideration paid, and in full consideration of $160,000.00

grant to Thomas James Jadlowe

at 198 North Main Street, Fairhaven, Massachusetts        with Quitclaim Covenants

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings
thereon, described as follows:

(Description and encumbrances, if any)

### SEE EXHIBIT "A" ATTACHED HERETO



*WITNESS* our hands and seals this 16th   day of March, 2001.

*Manuel C. Oliveira*

### COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                   March  16 , 2001

Then personally appeared the above-named Manuel C. Oliveira and acknowledged the
foregoing Instrument to be his free act and deed, before me

Notary Public

My Commission Expires:  10/1/03

Jadlowe partial title
07/04/2006
Jadlowe title info request
Page 7 of 13

9  //

EXH 1815
^ 3" -3

BK  4926 PG  26

### EXHIBIT "A"

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

| | |
|---|---|
| SOUTHERLY | Eighty (80) feet; thence |
| WESTERLY | One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue; thence |
| NORTHERLY | Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence |
| NORTHEASTERLY | therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street; and thence |
| EASTERLY | therein One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning. |

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed dated February 1, 2001 and recorded in the Bristol County (S.D.) Registry of Deeds in Book 4890, Page 10.

Subject to the real estate taxes for fiscal year 2001, which the grantee hereby assumes and agrees to pay.

Jadlowe partial title
07/04/2006
Jadlowe title information request
Page 8 of 13

10      12      EXHIBIT D-3

Return To:
MERITAGE MORTGAGE CORPORATION
6000 SOUTHWEST MEADOWS ROAD, SUITE 500
LAKE OSWEGO, OR   97035

BK   4926 PG   27
03/16/01 04:04  DOC. 6508
Bristol Co. S.D.

Prepared By:
MERITAGE MORTGAGE CORPORATION
8031 PHILLIPS HIGHWAY, SUITE 6
JACKSONVILLE, FL   32256

―――――――――――――――[Space Above This Line For Recording Data]―――――――――――――――

# MORTGAGE

Loan Number: 1000000084

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          MARCH 16, 2001          ,
together with all Riders to this document.
(B) "Borrower" is
THOMAS JAMES JADLOWE, A MARRIED MAN

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is

                    MERITAGE MORTGAGE CORPORATION,
                    AN OREGON CORPORATION
Lender is a
organized and existing under the laws of                    OREGON

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022  1/01

-6(MA) (0005)
Page 1 of 15          Initials:
      VMP MORTGAGE FORMS - (800)521-7291
DDS-MA3

EXHIBIT "B"   78

BK  4926 PG  28

Lender's address is 6000 SOUTHWEST MEADOWS ROAD, SUITE 500
LAKE OSWEGO, OR  97035
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated    MARCH 16, 2001
The Note states that Borrower owes Lender
One Hundred Twenty-Eight Thousand  & 00/100                                    Dollars
(U.S. $128,000.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       April 01, 2031           .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

Prepayment Rider

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6(MA) (0009)
D05-MA3                          Page 2 of 15          Initials: TG          Form 3022  1/01

12

BK  4926 PG  29

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the COUNTY                                                                          [Type of Recording Jurisdiction]
of                    BRISTOL                        [Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: MAP 128 LOT 157                          which currently has the address of
30 ARCH STREET                                                                        [Street]
SOUTH DARTMOUTH                              [City] , Massachusetts 02748        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(MA) (0005)                              Page 3 of 15                    Initials: _____          Form 3022  1/01
DDS-MA3

13

$RX 41317 "8" 30$

BK 4926 PG 30

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

-6(MA) (0005)
DO9-MA3

Page 4 of 18

Initials: [signature]

Form 3022  1/01

14

EXHIBIT "B" 31

BK   4926 PG   31

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

15



32
RXHIBIT "B"

BK   4926 PG   32

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6(MA) (0005)
006-MA3

Page 6 of 15

Initials: ___

Form 3022  1/01

*33*

16

*RX#1815 "R"*

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6(MA) (0005)
005-MA3

Page 7 of 15

Initials: _____

Form 3022  1/01

17

34

RK 4943 15 "R"

BK   4926 PG   34

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6(MA) (0008)           Page 8 of 15           Initials: _____           Form 3022  1/01
DDS-MA3

**18**

26
RXHIBIT "B"

BK 4926 PG 35

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6(MA) (0005)
DOS MA3

Page 9 of 15

Initials:

Form 3022  1/01

19

26
EXHIBIT "B"

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6(MA) (0005)
DOS-MA3

Page 10 of 15

Initials: _____

Form 3022   1/01

**20**

EXHIBIT "B"

BK  4926 PG  37

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

-6(MA) (0006)
DDS-MA3

Page 11 of 15

Initials: _____

Form 3022  1/01

21

35

EXHIBIT "A"

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6(MA) (0008)
DOS MA3

Page 12 of 15

Initials: _____

Form 3022  1/01

22

35
RK H(8(0 ' B "

BK  4926 PG  39

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law, Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

23

EXHIBIT "E"

BK  4926 PG  40

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
**THOMAS JAMES FADLOWE** -Borrower
**30 ARCH STREET**
**SOUTH DARTMOUTH, MA 02748**

_____

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

24

EXHIBIT "B"

BK 4926 PG 41

**COMMONWEALTH OF MASSACHUSETTS,**    Bristol    County ss:

On this    16th    day of    March, 2001    , before me personally appeared

Thomas James Jadlowe

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:    10/2/03

Notary Public

-6(MA) (0005)
DOS-MA 3

Page 15 of 15

Initials: _____

Form 3022  1/01

25

BK   4926 PG   42

# ADJUSTABLE RATE RIDER

(LIBOR 6 Month Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **16TH** day of
**MARCH, 2001** and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given
by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to:

**MERITAGE MORTGAGE CORPORATION,**

**AN OREGON CORPORATION**

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**30 ARCH STREET**

**SOUTH DARTMOUTH, MA   02748**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE
AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.     INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of **9.990** %. The Note provides for changes in the
interest rate and the monthly payments, as follows:

## 4.     INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **APRIL, 2004** , and on that
day every **6TH** month thereafter. Each date on which my interest rate could change is called a "Change
Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London Market
("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45
days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon
comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
**SIX AND THREE EIGHTHS** percentage points (**6.375** %) to the Current Index. The Note
Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).
Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the
next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to
repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my
new interest rate in substantially equal payments. The result of this calculation will be the new amount of my
monthly payment.

T88

26

EXHIBIT "E"

BK 4926 PG 43

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  12.990% or less than   9.990%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE AND ONE HALF                      percentage point(s) (   1.500 %) from the rate of interest I have been paying for the preceding     6       months. My interest rate will never be greater than  16.990%, or less than    9.990%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**DDS-WMK**                                          Page 2 of 3

BK  4926 PG  44

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Thomas James Gadlowe_     3-16-01     (SEAL)
THOMAS  JAMES  GADLOWE            DATE

DDS-WMK                    Page 3 of 3

28

46
EXHIBIT "E"

BK  4926 PG  45

## EXHIBIT "A"

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street;  thence

| | |
|---|---|
| SOUTHERLY | Eighty (80) feet;  thence |
| WESTERLY | One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue;  thence |
| NORTHERLY | Sixty-four and 46/100 (64.46) feet to an angle in said Avenue;  thence |
| NORTHEASTERLY | therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street;  and thence |
| EASTERLY | thereon One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning. |

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed of even date to be recorded herewith.

29

4b
EX H 181Y "h"

Recording Requested By:
ALTA REAL ESTATE SERVICES, INC.

When Recorded Return To:

RECONVEYANCE DEPARTMENT
ALTA REAL ESTATE SERVICES, INC
P.O. BOX 551170
ATTN: RECONVEYANCE DEPT.
JACKSONVILLE, FL 32255

**BK 6426 PG 76**
08/07/03 08:34 DOC. 38992
Bristol Co. S.D.

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

## DISCHARGE OF MORTGAGE

LOAN SERVICING CENTER #:4000572380 "JADLOWE" Lender ID:S10/1000594365  Bristol Southern District, Massachusetts
KNOW ALL MEN BY THESE PRESENTS that FAIRBANKS CAPITAL CORP. whose address is 10401 DEERWOOD
PARK BLVD., JACKSONVILLE, FL 32256 holder of a certain Mortgage, whose parties, dates and recording
information are below, does hereby acknowledge that it has received full payment and satisfaction of the same, and
in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: THOMAS JAMES JADLOWE, A MARRIED MAN
Original Mortgagee: MERITAGE MORTGAGE CORPORATION
Date Executed: 03/16/2001 Recorded: 03/16/2001 in Book/Reel/Liber: 4926 Page/Folio: 27 as Instrument No.: N/A

In the County of Bristol Southern District, State of Massachusetts

Property Address: 30 ARCH STREET, SOUTH DARTMOUTH, MA 02748

IN WITNESSOF, the said FAIRBANKS CAPITAL CORP. by its authorized officer, has hereunto set its corporate
seal.

FAIRBANKS CAPITAL CORP.
On June 5th, 2003

By: _____
R. COTTLE, Vice-President

STATE OF Florida
COUNTY OF Duval

On June 5th, 2003, before me, SARA J. HARDIN, a Notary Public in and for Duval County, in the State of Florida,
personally appeared R. COTTLE, Vice-President, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by
his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal,

_____
SARA J. HARDIN
Notary Expires: 12/15/2003 #CC895660

SARA J. HARDIN
NOTARY PUBLIC - STATE OF FLORIDA
COMMISSION # CC895660
EXPIRES 12/15/2003
BONDED THRU ASA 1-888-NOTARY1

(This area for notarial seal)

30

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

Prepared By:Ameriquest Mortgage Company

**BK 6203 PG 80**
05/12/03 04:18 DOC. 22755
Bristol Co. S.D.

Tammy Pacheco
92 Faunce Corner Rd. #
120,North Dartmouth, MA
02747

————————————————[Space Above This Line For Recording Data]————————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is datedMay 1, 2003
together with all Riders to this document.
(B) **"Borrower"** isThomas    James Jadlowe

Borrower is the mortgagor under this Security Instrument.
(C) **"Lender"** is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

0046967790 - 5790

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022 1/01

VMP -6(MA) (0005)
Page 1 of 15          Initials:
VMP MORTGAGE FORMS - (800)621-7291

05/01/2003 8:10:59 AM

**31**

Ex HIBIT "H"    47

**BK 6203 PG 81**

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated May 1, 2003
The Note states that Borrower owes Lender one hundred seventy thousand and 00/100

Dollars
(U.S. $170,000.00         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than June 1, 2033
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

EXhibit A

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

0046967790-5790
Initials: TJJ

-6(MA) (0005)                   Page 2 of 15    05/01/2003 8:10:59    Form 3022  1/01

32

EXHIBIT "H" 48

BK 6203 PG 82

(P) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County                                                                                [Type of Recording Jurisdiction]
of BRISTOL                                                      [Name of Recording Jurisdiction ]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF:

Parcel ID Number: 128:157                                which currently has the address of
30 Arch Street                                                                                [Street]
SOUTH DARTMOUTH                               [City] , Massachusetts02748      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

0046967790 -5790
Initials: ___
-6(MA) (0005)                    Page 3 of 15  05/01/2003 8:10:59 AM  Form 3022  1/01

**33**

## BK 6203 PG 83

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

0046967790 - 5790

Initials: ⟨handwritten⟩

-6(MA) (0005)                    Page 4 of 15        05/01/2003 8:10:59    Form 3022 1/01



# BK 6203 PG 84

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

35

  

# BK 6203 PG 85

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

0046967790 - 5790
Initials: 

-6(MA) (0005)        Page 6 of 15    05/01/2003 8:10:59    Form 3022  1/01

**36**

$RXH 1817$ "$H$"2

BK 6203 PG 86

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

0046967790 - 5790
Initials: ___

-6(MA) (0005)                    Page 7 of 15          05/01/2003  8:10:59      Form 3022  1/01

**37**

$Rx\ HIBIT\ "H"$

**BK 6203 PG 87**

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**



0046967790 - 5790
Initials: ___

**38**

$\beta \times 4 1 0 1 5$ "$H$" $54$

BK 6203 PG 88

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

0046967790 - 5790
Initials: TM
05/01/2003 8:10:59    Form 3022  1/01

-6(MA) (0005)    Page 9 of 15

39

RX #18TT "H" 54

BK 6203 PG 89

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0046967790 - 5790
Initials: ___

 -6(MA) (0005)          Page 10 of 15          05/01/2003 8:10:59          Form 3022 1/01

40



**BK 6203 PG 90**

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

41


EXHIBIT "H" 6

# BK 6203 PG 91

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



0046967790 - 5790
Initials: ᒥᒪᒪ



-6(MA) (0005)                    Page 12 of 15    05/01/2003 8:10:59    Form 3022 1/01

42        ฿XH18,J "H" 57

# BK 6203 PG 92

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.



$Ex$ H $1$ $B$ $1$ $J$ $"$ $H$ $"$    58

# BK 6203 PG 93

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Thomas   James  Jadlowe          -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                      -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                      -Borrower

0046967790 - 5790

VMP -6(MA) (0006)                Page 14 of 15 05/01/2003 8:10:59 AM Form 3022 1/01

44

EXHIBIT "H" 5

BK 6203 PG 94

**COMMONWEALTH OF MASSACHUSETTS,** BRISOL County **ss:**

On this \_\_\_1ST\_\_\_ day of \_\_\_MAY, 2003\_\_\_ before me personally
        Day                    Month/Year

appeared

\_\_\_THOMAS    JAMES    JADLOWE\_\_\_

_____

to me known to be the person(s) described in and who executed the foregoing instrument, and
acknowledged that he/she/they executed the same as his/her/their free act and deed.

My Commission Expires:

CARLA F. BAUMGARTNER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
December 12, 2008

_____
Notary Public



400-15MA (4/02)                    Page 15 of 15              0046967790 - 5790

                                   TJJ                        05/01/2003 8:10:59 AM

45                    RX HIBIT "H" 60

**BK 6203 PG 95**

## ADJUSTABLE RATE RIDER

### (LIBOR Six-Month-Index (As Published in the Wall Street Journal)- Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 1st day of May , 2003    and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Ameriquest Mortgage Company (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

30 Arch Street, SOUTH DARTMOUTH, MA  02748
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of  6.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

### 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

#### (A) Change Dates

The interest rate I will pay may change on the first day of June, 2005 , and on that day every sixth  month thereafter. Each date on which my interest rate could change is called a "Change Date."

#### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as  published in the Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.

Initials  T J J

Loan Number:  0046967790 - 5790

05/01/2003 8:10:59 AM

4b

RX 4 1815  " H "    6 2

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **five** percentage points ( **5.000** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **8.990% or less than 6.990%.** Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  One( **1.000 %**) from the rate of interest I have been paying for the preceding   six months. My interest rate will never be greater than 12.990)% or less than 6.990)%.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Initials _T JJ_

Loan Number: 0046967790 - 5790

# BK 6203 PG 97

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing. If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Thomas James Jadlowe_ (Seal)    _____ (Seal)
Borrower Thomas James Jadlowe              Borrower

_____ (Seal)    _____ (Seal)
Borrower              Borrower

Loan Number: 0046967790 - 5790

05/01/2003 8:10:59 AM

48

$RXH 18 iT$ $^K H^i$   64

BK 6203 PG 98

## EXHIBIT A
## LEGAL DESCRIPTION

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, situated and described as follows:

Beginning at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

SOUTHERLY Eighty (80) feet; thence

WESTERLY One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue; thence

NORTHERLY Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street; and thence

EASTERLY therein One Hundred Forty-Five and 93/100 (145.93) feet to the point of beginning. BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 part of Howland Farms, dated December 28, 1915 and filed in Bristol County South District Registry of Deeds in Book 4890, Page 10.

For title reference, see deed recorded with said Registry Deeds in Book 4926, Page 25.

49

EXHIBIT "H" 65

# LOAN POLICY
## SCHEDULE A

File No.: 11745

| Policy No. | Date of Policy | Amount of Insurance: $0.00 | Premium: $0.00 |
|---|---|---|---|
| Policy No. 101968943 MAEL | Date of Policy 5/12/2003 @ 4:18 PM | Amount of Insurance: $170,000.00 | Premium: $0.00 |

| [X] | Please indicate if this loan is a refinance. |
|---|---|
| [X] | Please indicate if this loan is a variable rate mortgage. |
| [ ] | Please indicate if this loan is a negative amortization mortgage. |

| Policy No(s). | Amount(s) of Insurance |
|---|---|

Street Address of the Land: 30 Arch Street, South Dartmouth, Massachusetts 02748

1.  Name of Insured:
    **Ameriquest Mortgage Company, its successors and/or assigns as their interests may appear**

2.  The estate or interest in the land described in this Schedule and which is encumbered by the insured mortgage is:

    Fee Simple.

3.  Title to the estate or interest in the Land is vested in:

    Thomas James Jadlowe

4.  The Insured Mortgage and assignments thereof, if any, are described as follows:

    Mortgage from Thomas James Jadlowe to Ameriquest Mortgage Company, in the original principal amount of $170,000.00, dated 5/1/2003, and recorded in the Bristol County South District Registry of Deeds in Book 6203, Page 80 on 5/12/2003.

5.  The land referred to in this policy is located at:

    | Address: | 30 Arch Street |
    |---|---|
    | Lot No(s): | |
    | Subdivision: | |
    | City/Town: | South Dartmouth |
    | County: | Bristol |
    | State: | Massachusetts |

    and is described as set forth in Exhibit "A" attached hereto and made a part hereof.

Daniel J. Nigro
Authorized Signatory

Law Offices of Daniel J. Nigro, P.C.

**This Schedule A Is Valid With First American Eagle Policy Only**
**0046967790-5790**

50

EXHIBIT "I"



BK  4926 PG  25
83/15/01 04:53  ENK, 8001
Bristol Co. S.D.

## MASSACHUSETTS QUITCLAIM DEED

I, MANUEL C. OLIVEIRA

of Dartmouth                                     Bristol County, Massachusetts,

being unmarried, for consideration paid, and in full consideration of $190,000.00

grant to Thomas James Jadlowe

at 158 North Main Street, Fairhaven, Massachusetts        with Quitclaim Covenants

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, described as follows:

(Description and encumbrances, if any)

### SEE EXHIBIT "A" ATTACHED HERETO

WITNESS our hands and seals this 16th  day of March 2001

_____        *Manuel C. Oliveira*

_____        _____

### COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                                     March  16 , 2001

Then personally appeared the above-named Manuel C. Oliveira and acknowledged the foregoing instrument to be his free act and deed, before me,

_____
Notary Public

My Commission Expires  10/4/02

51

Rx HIBIT "I"

BK  4926 PG  26

### EXHIBIT "A"

The land in Dartmouth, Bristol County, Commonwealth of Massachusetts, with all buildings thereon, bounded and described as follows:

BEGINNING at the northeasterly corner thereof at a point in the south line of Arch Street, Six Hundred Twenty-three and 54/100 (623.54) feet distant therein westerly from its intersection with the west line of Bedford Street; thence

SOUTHERLY     Eighty (80) feet; thence

WESTERLY      One Hundred Forty and 01/100 (140.01) feet to the east line of Howland Avenue; thence

NORTHERLY     Sixty-four and 46/100 (64.46) feet to an angle in said Avenue; thence

NORTHEASTERLY  therein Twenty-nine and 23/100 (29.23) feet to said south line of Arch Street; and thence

EASTERLY      therein One Hundred Forty-five and 93/100 (145.93) feet to the point of beginning.

BEING Lot Nos. 458, 459, 460 and 461 on Plan of No. 2 of part of Howland Farms, dated December 28, 1915 and filed in the Bristol County (S.D.) Registry of Deeds.

For my title, see Deed dated February 1, 2001 and recorded in the Bristol County (S.D.) Registry of Deeds in Book 4890, Page 10.

Subject to the real estate taxes for fiscal year 2001, which the grantee hereby assumes and agrees to pay.

$5V$   AxHIBIT "I"

# LAW OFFICE OF DANIEL J. NIGRO, P.C.

ATTORNEYS AT LAW
304 TURNPIKE ROAD
SOUTHBOROUGH, MASSACHUSETTS 01772

DANIEL J. NIGRO
RICHARD D. SHEA
JOSHUA D. NEGRICH
NICHOLAS E. THALHEIMER
MATTHEW P. RODLIFF
MELISSA A. GABOURY
THOMAS G. RAMONDETTA

TELEPHONE (508) 485-7005
FACSIMILE (508) 485-7047

TITLE DEPARTMENT FACSIMILE (508) 485-7047

**WOBURN OFFICE:**
18 COMMERCE WAY
SUITE 1650
WOBURN, MA 01801
TELEPHONE (781) 935-5855
FACSIMILE (781) 935-5810

**CT OFFICE:**
60 GILLETT ST., STE 406
HARTFORD, CT 06105
TELEPHONE: (860) 236-7005
FACSIMILE: (860) 236-7005

**PLEASE RESPOND TO THE
SOUTHBOROUGH OFFICE**

## FAX COVER SHEET

DATE:

COMPANY NAME: _____ *Don Flemming* _____

ATTENTION: _____ ( ) _____

FAX NUMBER: _____ *508 758 3406* _____

FROM:

Number of pages, including cover sheet: ___ 4 ___

RE: ___ *50 Arch St.* ___

MESSAGE:

*53*

*PLX HIBIT "I"*

********** CONFIDENTIALITY NOTICE ***********

This facsimile is intended only for the individual entity named above and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this message, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and destroy the original transmission without making a copy. Please call (508) 485-7005 if you do not receive all pages

# Mathieu & Mathieu

Attorneys and Counsellors At Law

168 EIGHTH STREET
CORNER OF EIGHTH AND ELM STREETS
NEW BEDFORD, MASSACHUSETTS 02740

THOMAS J. MATHIEU
JOHN P. MATHIEU
PAULA MATHIEU CHAUSSE

TELEPHONE (508) 996-8283
FAX (508) 994-0155
E-MAIL: MAILBOX@MATHIEU-LAW.COM

PAUL J. MATHIEU of Counsel
HON. JOHN A. MARKEY of Counsel

June 23, 2006

Donald J. Fleming, Esq.
86 Church Street
Mattapoisett, MA 02739

Dear Attorney Fleming:

Enclosed herewith, please find a Deed dated June 30, 1999 from Manuel C.
Oliveira, Individually, to himself with a Life Estate. It is a very common procedure in
our area to create these deeds of Life Estate. As a matter of fact, most Estate Planners are
using this type of Deed with Life Estate to avoid Probate.

I have also enclosed a Deed from Manuel C. Oliveira to Thomas James Jadlowe
dated September 12, 2000.

Very truly yours,
MATHIEU & MATHIEU

PAUL J. MATHIEU

PJM/dlr
enc.
ff:       07/07/06

54

EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 05-10306-RGS |
| | ) |
| MARK JADLOWE, a/k/a | ) |
| "UNCLE MARK" et al., | ) |
| Defendants. | ) |

## UNITED STATES' OPPOSITION TO THOMAS JADLOWE'S MOTION FOR PARTIAL RELIEF FROM POST-INDICTMENT RESTRAINING ORDER AND *LIS PENDENS*

The United States of America, by and through its attorney,

Michael J. Sullivan, United States Attorney for the District of

Massachusetts, hereby opposes Thomas Jadlowe's motion for relief

from the post-indictment restraining order and *Lis Pendens* that the

United States has obtained to safeguard its interest in the real

property located at 30 Arch Street, Dartmouth, MA ("the Arch Street

Property"). This motion, which contemplates refinancing the real

property located at Arch Street and taking approximately an

additional $20,000 in equity out of the Arch Street Property should

be denied for the following reasons. First, Mark Jadlowe, one of

the criminal defendants in this case, is the owner of the real

property and Thomas Jadlowe lacks any legal interest in the Arch

Street Property. Second, Thomas Jadlowe should not be permitted to

take any additional equity out of the Arch Street Property.

Whatever equity remains in the property should be preserved for

forfeiture to the United States. Finally, contrary to Thomas

Jadlowe's assertions, he is unlikely to prevail in ancillary

1

$5

UK 41818 "J"

forfeiture proceedings.

1.  **Thomas Jadlowe has no legal interest in the Arch Street**
**Property.**  As an initial matter, the motion should be denied
because a review of the records relating to the Arch Street
Property's title demonstrates that Mark Jadlowe is the owner of the
Arch Street Property.  Thomas Jadlowe has no current legal interest
in the Arch Street Property and, therefore, lacks standing to
intervene in this criminal proceeding.

The history of the Arch Street Property shows a long series of
suspicious transfers, many for nominal amounts, back and forth
between members of the Jadlowe family.  On June 30, 1999, Mark
Jadlowe conveyed the Arch Street Property, by quitclaim deed and
for nominal consideration, to Manuel Oliviera, Mark Jadlowe's
grandfather.  See Exhibit A.  On that same date, June 30, 1999, a
second quitclaim deed was filed in which Manuel Oliviera granted
himself a life estate in the Arch Street Property and conveyed the
remainder back to Mark Jadlowe.  See Exhibit B.  On September 12,
2000, Manuel Oliviera transferred his interest, that is, a life
estate, in the Arch Street Property to Thomas Jadlowe, father of
Mark Jadlowe and  former son-in-law of Manuel Oliviera, for the sum
of $1.00.  See Exhibit C.  On February 2, 2001, Thomas Jadlowe
conveyed his interest, the life estate he had received from Manuel
Oliviera, back to Manuel Oliveira for the sum of $1.00.   See
Exhibit D.  On March 16, 2001, Manuel Oliviera once again conveyed

2

56

$R \times 11 \, 18 \, 17 \, " \, J \, "$

his interest in the Arch Street Property back to Thomas Jadlowe, this time for $160,000. See Exhibit E. Under well-established principles of property law, Manuel Oliviera could transfer to Thomas Jadlowe only that interest that he held at the time -- in other words, a life estate for the life of Manuel Oliviera. Cf. Bongaards v. Millen, 440 Mass. 10, 793 N.E.2d 335, O'Neill v. Sullivan, 256 Mass. 76, 152 N.E. 341 (Mass. 1926);

Manuel Oliviera died on November 30, 2003. At that time, Thomas Jadlowe's interest in the Arch Street Property ceased to exist, and title to the property passed to Mark Jadlowe, as holder of the remainder. Therefore, since Thomas Jadlowe lacks any current legal interest in the Arch Street Property, he should not be permitted to seek any relief in this criminal proceeding.

**2. The equity in the Arch Street Property should be preserved for criminal forfeiture to the United States.** By his motion, Thomas Jadlowe seeks to extract approximately $20,000 in equity from the Arch Street Property. Allowing this motion would lessen the value left for forfeiture to the United States. A review of the records relating to the Arch Street Property's title show two outstanding mortgages totaling approximately $298,000: a mortgage for approximately $128,000 held by Meritage Mortgage Corporation[1] and a mortgage for approximately $170,000 held by Ameriquest Mortgage

---

[1]   No release has been filed with the Registry of Deeds indicating that the Meritage loan has been paid off.

3

57

$EXHIBIT$ "J"

Company. According to the Town of Dartmouth tax assessor's website, the current assessed value of the Arch Street Property is $235,200. Given these outstanding mortgages, there appears to be relatively little equity available for forfeiture to the United States. Allowing Thomas Jadlowe to take out a mortgage for an additional $20,000 would leave even less equity available for forfeiture. He should not be permitted to do so by this Court.

**3.  Thomas Jadlowe would not prevail in ancillary criminal forfeiture proceedings**. In a criminal drug forfeiture proceeding, a property is subject to forfeiture pursuant to 21 U.S.C. §853(a)(2) if it is "property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, [a federal criminal drug] violation." Here, it is undisputed that the Arch Street Property was used to facilitate illegal drug trafficking, since 10 kilograms of cocaine were delivered to the Arch Street Property on November 4, 2005 and seized by law enforcement officers.

Given the uncontested fact that the Arch Street Property was used for illegal drug dealing, under the relevant criminal statutes, Thomas Jadlowe's claimed lack of knowledge of this drug dealing is irrelevant. The issue in ancillary criminal forfeiture proceedings would be whether Thomas Jadlowe, rather than Mark Jadlowe, was the true owner of the Arch Street Property, a showing that it would be Thomas Jadlowe's burden to prove by a

4

$\zeta\zeta$

$Ex 41815 "J"$

preponderance of the evidence.   See Federal Rule of Criminal Procedure 32.2(c); 21 U.S.C. §853(n).   Contrary to his assertions in his motion, Thomas Jadlowe would be unable to make such a showing.   Not only do the records described above demonstrate that any legal interest that Thomas Jadlowe had in the Arch Street Property ended in 2003, but Thomas Jadlowe concedes in his motion that he does not live at the main unit of the Arch Street Property and that it is not habitable.   See Motion at 1-2.   On the other hand, Mark Jadlowe, as noted in the United States' filings in support of a restraining order, was seen on a daily basis at the Arch Street Property during the course of the criminal investigation.   In addition, the history of suspicious transfers described above strongly suggests a concerted effort to conceal the ownership of the Arch Street Property by Mark Jadlowe and vitiates any claim by Thomas Jadlowe to be the owner of the Arch Street Property.   Since Thomas Jadlowe would not be able to prevent the Arch Street Property from being criminally forfeited to the United States, he should not be able to reduce the value available for forfeiture by reducing the equity in the Arch Street Property.

5

59

BXHIBIT "J"

## CONCLUSION

WHEREFORE, the United States moves that this Court deny Thomas Jadlowe's Motion for Partial Relief from the Post-Indictment Restraining Order and *Lis Pendens*.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney,

/s/Jennifer H. Zacks
WILLIAM CONNOLLY
JENNIFER H. ZACKS
Assistant U.S. Attorneys
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Date: April _18, 2006

## CERTIFICATE OF SERVICE

I, Jennifer H. Zacks, Assistant U.S. Attorney, hereby certify that the foregoing document has been filed through the Electronic Court Filing system will be sent electronically to the registered parties as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/Jennifer H. Zacks
JENNIFER H. ZACKS
Assistant U.S. Attorney

Date: April 18, 2006

60

EXHIBIT "J"

# Commonwealth of Massachusetts
## County of Bristol
## The Superior Court

Civil Docket **BRCV2004-01358**

RE:    Frates et al v Jadlowe et al

TO:    Donald J Fleming, Esquire
       86 Church Street
       Mattapoisett, MA 02739

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on **04/03/2007**:

*RE: Plaintiff Maryanne Frates, Lisa Frates's Emergency MOTION for a separate trial and memorandum in support.*

**is as follows:**

**MOTION (P#13) Allowed, nunc pro tunc to March 27, 2007. Further, on the basis of the evidence and arguments presented at the March 27, 2007 trial of the bifurcated issue of the sufficiency of the subject ZBA decision and the supplementary memoranda submitted by counsel, the matter is Remanded to the ZBA for specific specific findings of fact as to "soil conditions, shape, or topography " as relates to the "land or structures" as required by G.L. 40A, S10. See Wolfson v Sun Oil Co., 357 Mass. 87, 89 (1970). (D. Lloyd MacDonald, Justice). Notices mailed 4/12/2007**

Dated at Fall River, Massachusetts this 12th day of April, 2007.

Marc J. Santos,
Clerk of the Courts

BY:

Peter R. Andrade
Assistant Clerk

Telephone: (508) 672-4464

Copies mailed 04/12/2007

61

*EXHIBIT "K"*